**CHEMICAL WASTE MANAGEMENT, INC.**

v.

**Paul H. TEMPLET, Ph.D., Secretary of the Louisiana Department of Environmental Quality.**

**Civ. A. No. 89–761–B.**

United States District Court, M.D. Louisiana.

July 9, 1991.

Gerald L. Walter, Anne J. Crochet, Baton Rouge, La., for plaintiff.

John B. King, Ann Coco, Office of Legal Affairs and Enforcement, Dept. of Environmental Quality, Baton Rouge, La., for defendant.

## OPINION

POLOZOLA, District Judge.

This case requires the Court to determine whether Louisiana's ban on the importation of hazardous waste from foreign countries violates the United States Constitution.

Chemical Waste Management, Inc. (ChemWaste) has filed this action seeking declaratory relief against the defendant, Paul H. Templet, Ph.D., Secretary of the Louisiana Department of Environmental Quality (LDEQ),[1] challenging the constitutionality of Louisiana Revised Statutes (La. R.S.) 30:2190 and 30:2191, which govern the importation, storage, and disposal of hazardous waste in the State of Louisiana that is generated in foreign countries.[2] The issue the Court must decide is whether the State of Louisiana can prohibit a state-authorized treatment, storage, and disposal facility from receiving hazardous waste generated in Mexico by "maquiladoras" companies.[3] In reasons which follow, the Court finds that La.R.S. 30:2190 and 30:2191 are unconstitutional and invalid under the Commerce Clause of the United States Constitution.

## I. BACKGROUND

The facts involved in this case are not seriously disputed by the parties. Chem-Waste owns and operates an LDEQ authorized hazardous waste treatment, storage, and disposal facility in Carlyss, Louisiana (Carlyss).[4]

---

1. Originally, ChemWaste asked for both injunctive relief and a declaratory judgment. The LDEQ counterclaimed seeking to enjoin Chem-Waste from receiving any foreign hazardous waste. In accordance with a Stipulation, Chem-Waste agreed not to receive any foreign hazardous waste during the pendency of this suit and both parties withdrew their requests for injunctive relief.

2. The Court has subject matter jurisdiction under 28 U.S.C. § 1332 and venue is proper under 28 U.S.C. § 1391.

3. "Maquiladoras" are companies incorporated under Mexican corporate law which may be 100% foreign owned and/or managed. The corporation is allowed to import its raw materials and other items into Mexico without paying Mexican import taxes. See Rose, Transboundary Harm: Hazardous Waste Management Problems and Mexico's Maquiladoras, 23 Int'l Law. 223, 223–26 (1989).

4. A company seeking to operate a hazardous waste treatment, storage, or disposal facility in Louisiana must obtain authorization from the LDEQ.

On September 22, 1989, and September 28, 1989, ChemWaste informed the Regional Administrator of the United States Environmental Protection Agency (EPA), in Dallas, Texas, of its intent to receive foreign hazardous waste generated from Inland System Business Unit of Inland/Matamores, Mexico (Inland), and Trico Technologies of Matamores, Mexico (Trico), two maquiladoras companies, at the Carlyss facility.[5] ChemWaste advised the EPA that the foreign hazardous waste being shipped to the United States was waste which the maquiladoras companies were mandated to return to the United States by Annex III of the "Agreement Between the United States of America and the United Mexican States on Cooperation for the Protection and Improvement of the Environment in the Border Area" (U.S.–Mexican Agreement).[6] Annex III provides:

Hazardous waste generated in the processes of economic production, manufacturing, processing or repair, for which raw materials were utilized and temporary admitted, shall continue to be readmitted by the country of origin of the raw materials in accordance with applicable national policies, laws and regulations.[7]

The EPA advised ChemWaste that, since the State of Louisiana was an "authorized" state under the Recovery Conservation and Recovery Act (RCRA), the State of Louisiana and not the EPA was the proper party to be notified regarding the receipt of hazardous waste from Mexico.[8] Relying on La.R.S. 30:2190 and 30:2191, the LDEQ objected to ChemWaste's importation, storage, and disposal of the Mexican foreign hazardous waste in Louisiana and refused to grant the plaintiff a permit.

ChemWaste filed this suit challenging the constitutionality of the Louisiana statutes on the grounds that the Louisiana statutes are inconsistent with the federal statutory provisions under RCRA and violate both the Commerce Clause and the Supremacy Clause of the United States Constitution.

## II. LOUISIANA'S FOREIGN GENERATED HAZARDOUS WASTE LAWS AND THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976

To fully understand the legal issues involved in this case, it is necessary to compare the Louisiana statutes with RCRA.

La.R.S. 30:2190 [9] is entitled "Hazardous wastes from foreign nations; findings; prohibitions" and provides:

A. The legislature finds and declares that:

(1) The laws of the United States require testing, manifesting, and safe transportation of hazardous wastes to insure proper identification and handling from

5. 40 CFR 264.12(a) requires that the EPA Regional Administrator be notified in writing by the owner of a facility that has arranged to receive hazardous waste from a foreign source at least four weeks before the date the waste is expected to arrive at the facility.

6. TIAS 10827; 19 Weekly Comp.Pres.Doc. 1137 (Aug. 14, 1984) [hereinafter U.S.–Mexican Agreement]. The Agreement is an "executive agreement" consummated by the President of the United States without the United States Senate's confirmation. *U.S. v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). The Agreement was signed on August 14, 1983, by President Ronald Reagan, for the United States of America, and President Miguel de la Madrid Hurtado, for Mexico. *See* Recent Developments, 25 Harv. Int'l L.J. 195, 239 (1984); Note, The Environmental Cooperation Agreement Between Mexico and the United States: A Response to the Pollution Problem of the Borderlands, 19 Corn. Int'l L.J. 87, 122 (1986). Annex III to the Agreement, "Agreement of Cooperation Between the United States of America and the United Mexican States Regarding the Transboundary Shipments of Hazardous Wastes and Hazardous Substances" [hereinafter Annex III], was executed on November 12, 1986, by representatives of each county's executive branch, in accordance with Articles 3 and 22 of the U.S.–Mexican Agreement. *See* Rose, *supra* note 3, at 240–42.

7. Annex III, art. XI, *supra* note 6.

8. Pub.L. No. 89–272, Tit. II, § 1002, 90 Stat. 2795 (1976), codified at 42 U.S.C.A. §§ 6901–6992k (West 1983 & Supp.1991); 42 U.S.C.A. § 6926 (West 1983 & Supp.1991); 40 CFR §§ 123.1–123.64 & 271.1–271.138.

9. Added by 1983 La.Acts No. 694, § 1, effective July 21, 1983, and amended by 1984 La.Acts No. 826, § 1, and 1987 La.Acts No. 506, § 1.

generation to ultimate disposal. These laws are not applicable to hazardous wastes generated in foreign nations until such wastes are actually in this country.

(2) The laws of foreign nations are inadequate to insure that hazardous wastes sought to be exported to the United States do not contain unknown or unauthorized pollutants and that such wastes are not released into the environment due to inadequate containment, labeling, or handling during transport.

(3) The only practical method for insuring that the environment and the health of the citizens of this state are not endangered by the importation of hazardous wastes generated in foreign nations is to prohibit the introduction or receipt of such wastes into this state for the purpose of treatment, storage, or disposal.

B. It shall be unlawful for any person to transport or cause or allow to be transported into this state, for the purpose of treatment, storage, or disposal, any hazardous waste generated outside the United States and its territories.

C. It shall be unlawful for any person to receive for treatment, storage, or disposal in this state any hazardous waste generated outside the United States and its territories.

D. This Section shall not apply to any hazardous waste generated outside of the United States and its territories which must be disposed of in accordance with the provisions of Public Law 96–478 adopted by the United States Congress and known as the Act to Prevent Pollution from Ships [33 U.S.C. § 1901 *et seq.*]. This Section shall only apply to hazardous waste which is imported into this state directly from a foreign nation.

E. Notwithstanding any other provisions of law, the importation of spent petroleum catalysts from foreign countries for purposes of recycling utilizing processes which produce no hazardous wastes, is not prohibited.

La.R.S. 30:2191 [10] is entitled "Importation of hazardous waste from foreign countries; prohibition" and states:

A. The commission or the assistant secretary shall deny hazardous waste transporter licenses and hazardous waste treatment, storage, and disposal facility permits to all persons who propose to treatment into and dispose of in Louisiana hazardous waste generated in a country other than the United States.

B. The provisions of this Section shall not apply to the disposal or storage of any hazardous or solid waste which must be disposed of according to the provisions of Public Law 96–478, adopted by the United States Congress and known as the Marine Pollution Protocol Law [33 U.S.C. § 1901 *et seq.*].

C. The Commission shall revoke the permit of any permitted hazardous waste facility which hereafter disposed of hazardous waste generated in a country other than the United States. This power shall be in addition to other powers and remedies available to the Commission under this subtitle.

D. The provisions of this Section shall not apply to spent petroleum catalysts from foreign countries imported for purposes of recycling utilizing processes which produce no hazardous wastes.

The LDEQ contends that the above statutes are valid and constitutional because the EPA reviewed and approved Louisiana's environmental laws, and designated the State of Louisiana as an "authorized" state in accordance with RCRA.

The Congress enacted RCRA to be a "cradle-to-grave" regulatory program which established "minimum standards for the generation, treatment, storage, and disposal of hazardous waste." [11] It is also

---

**10.** Added by 1983 La.Acts No. 260, § 1, effective June 30, 1983, and amended by 1987 La.Acts No. 506, § 1.

**11.** Legislative History of House Comm. on Resource Conservation and Recovery Act of 1976, H.R.Rep. No. 94–1491, Pt. I, 94th Cong., 2d Sess., *reprinted in,* 1976 U.S.Code Cong. & Admin.News, 6238, 6244 [hereinafter Legislative History]; *National Solid Wastes Management Assoc. v. Alabama Dept. of Envtl. Management,* 910 F.2d 713, 722 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991).

clear that the Congress did not intend to preempt all state environmental laws when it enacted RCRA. The legislative history of RCRA provides that "the states are given, if they chose, the authority to establish and implement a state program in lieu of a federal program, if such a program is equivalent to the federal program." [12] In order for the states to implement such a program, RCRA provides a method for a state to have its hazardous waste program authorized by the EPA to operate in lieu of the minimum standards of the federal program. [13] This procedure requires a state to submit its program to the EPA for review and a public hearing. [14] In order for a state to establish and implement a program in lieu of the federal program, the state program cannot deviate below RCRA's minimum standards *and* the state program must not be inconsistent "with Federal or State programs applicable in other States." [15] States are not precluded from "adopting or enforcing requirements which are more stringent or more extensive" or "operating a program with greater scope of coverage" than required by the minimum federal standards. [16] However, the state's approved program must operate in accordance with the federal requirements to remain authorized. [17]

The State of Louisiana followed the above procedures when it applied for interim authorization from the EPA to operate its hazardous waste program in lieu of the federal program on December 19, 1980, and January 24, 1984. The EPA granted Louisiana final authorization for its program on January 24, 1985. ChemWaste acknowledges that Louisiana is an authorized state under RCRA. However, ChemWaste contends that La.R.S. 30:2190 and 30:2191 are

inconsistent with federal programs and, therefore, cannot operate in lieu of the federal RCRA program. [18] In response to ChemWaste's arguments, the LDEQ contends that the statutes were enacted [19] into law prior to the time the State of Louisiana received its authorized status from the EPA. Therefore, the LDEQ argues that the EPA approved the use of §§ 2190 and 2191 when it approved Louisiana as an authorized state. [20] The LDEQ further argues that §§ 2190 and 2191 were reviewed and approved by the EPA to operate in lieu of the federal statutes and, therefore, are valid and constitutional.

It is not necessary for the Court to determine whether the Louisiana statutes are consistent with RCRA because the Court finds that, regardless of whether or not the statutes are valid and effective under RCRA, §§ 2190 and 2191 are unconstitutional under the Commerce Clause of the United States Constitution. [21]

## III. LA.R.S. 30:2190 AND 30:2191 VIOLATE THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION

■ The Commerce Clause of the United States Constitution grants to the Congress the power and authority "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." [22] The Congress has the authority and power to regulate both interstate and foreign commerce. Even where the Congress has failed to pass legislation to regulate interstate or foreign commerce, the states are limited in their ability to discriminate or place barriers against interstate

12. Legislative History, *supra* note 11, at 6244.

13. 42 U.S.C.A. § 6926(b) (West Supp.1991); 40 CFR § 123.

14. *Id.*

15. *Id.* § 6926(b).

16. 40 CFR § 123.1(i).

17. *Id.* § 123.1.

18. *See* 42 U.S.C.A. § 6926(b) (West Supp.1991).

19. La.R.S. 30:2190–2191 (West 1989) were effective on July 31, 1983 and June 30, 1983, respectively; *see supra* notes 9–10.

20. RCRA allows an authorized state to provide more stringent, yet consistent, environmental laws than those provided under the federal program.

21. U.S. Const. art. I, § 8, cl. 3.

22. *Id.*

and foreign commerce.[23] ChemWaste contends the statutes present an unconstitutional burden on both interstate and foreign commerce. The Court agrees that §§ 2190 and 2191 place an unconstitutional burden on interstate commerce.

### A. The Interstate Commerce Clause of the United States Constitution Under the Facts of this Case.

The Commerce Clause is not implicated unless the object is subject to constitutional protection. The United States Supreme Court has set forth certain guidelines which must be followed to resolve the issues in this case. Thus, it is clear that "[a]ll objects of interstate trade merit protection; none is excluded by definition at the outset." [24] A state may prohibit transportation of an object across state lines when "the article's worth in interstate commerce [is] far outweighed by the dangers inhering in their very movement." [25] Where the movement of non-hazardous waste is involved, the Supreme Court has held that "[j]ust as Congress has power to regulate the interstate movement of these wastes, States are not free from constitutional scrutiny when they restrict that movement." [26]

Certain objects "are not legitimate subjects of trade and commerce." [27] Such objects are those objects which in their existing condition at the time of transport could not be safely brought into the state without the risk of the "spread [of] disease, pestilence, and death." [28] It could be argued that certain hazardous waste fit into this category. However, in *National Solid Wastes Management Assoc. v. Alabama Department of Environmental Management*, the Eleventh Circuit, relying on the Supreme Court's decision in *City of Philadelphia v. New Jersey*, held that hazardous waste is an object of commerce and subject to the Commerce Clause.[29] The Eleventh Circuit reasoned:

> Although the hazardous waste involved in this case may be innately more dangerous than the solid or liquid waste involved in *City of Philadelphia*, we cannot say that the dangers of hazardous waste outweigh its worth in interstate commerce. Congress has defined hazardous waste as "a solid waste ... which ... may ... cause, or significantly contribute to a significant increase in mortality or an increase in serious ... illness, or ... pose a substantial present or potential hazard to human health or the environment when *improperly* treated, stored, transported, or disposed of, or otherwise managed." The legislature and executive branches of the federal government together with the separate states have developed a comprehensive scheme from regulating hazardous waste.... To the extent these rules can and do provide for the safe transportation of hazardous waste, the dangers associated with hazardous waste movement

---

**23.** *Healy v. Beer Institute, Inc.,* 491 U.S. 324, 325 n. 1, 109 S.Ct. 2491, 2493 n. 1, 105 L.Ed.2d 275 (1989); *New Energy Company of Indiana v. Limbach,* 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988); *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 35–36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980); *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978); *New Orleans S.S. Assoc. v. Plaquemines Port,* 874 F.2d 1018, 1022 (5th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 2172, 109 L.Ed.2d 502 (1990); *Radio WHKW, Inc. v. Yarber,* 838 F.2d 1439, 1442–43 (5th Cir.1988); *Tenneco, Inc., v. Sutton,* 530 F.Supp. 411, 439 (M.D.La.1981).

**24.** *City of Philadelphia v. New Jersey,* 437 U.S. 617, 622, 98 S.Ct. 2531, 2534, 57 L.Ed.2d 475 (1978).

**25.** *Id.*

**26.** *Id.* at 622–23, 98 S.Ct. at 2535.

**27.** *Id.* at 622, 98 S.Ct. at 2534 (quoting *Bowman v. Chicago & Northwestern R. Co.,* 125 U.S. 465, 489, 8 S.Ct. 689, 700, 31 L.Ed. 700 (1888)).

**28.** *Id.*

**29.** 910 F.2d 713, 719 (11th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). *See Alabama v. United States EPA,* 871 F.2d 1548, 1555 n. 3 (11th Cir.), *cert. denied sub nom., Alabama ex rel. Siegleman v. United States EPA,* — U.S. ——, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989).

do not outweigh the value of moving hazardous waste across state lines.[30]

■ While the waste considered in the above case was generated within the United States, the Court believes that the same principles and reasoning apply to the foreign generated hazardous waste involved in this case. The Court's conclusion is reinforced by the fact that the same type of hazardous waste is already being transported into and disposed of in Louisiana.

The hazardous waste which the LDEQ seeks to prohibit from being stored or disposed of in Louisiana consists of paint solvents used in spray painting of automobile windshield wiper blades (Trico) and automobile dash boards and other interior automotive parts (Inland). The hazardous waste involved in this case is not the type that, in its existing condition, would spread disease by its mere transportation into the State of Louisiana. Although the hazardous waste which the plaintiff seeks to dispose of in Louisiana is generated in Mexico, the Carlyss facility is already receiving the same type of hazardous waste from plants located *within* the United States. The only difference between the Mexican and United States waste is that Mexican water is used in Mexico while American water is used in the United States. Therefore, the Court finds that the foreign generated hazardous waste involved in this case is an object of commerce and subject to the protection of the Commerce Clause of the United States Constitution.

Louisiana law makes it unlawful for any person to transport into the state "for the purposes of treatment, storage, or disposal *any hazardous waste generated outside the United States and its territories.*"[31] The LDEQ commission or the assistant sec-

retary must "deny hazardous waste transporter licenses and hazardous waste treatment, storage, and disposal facility permits" to any person desiring to transport and/or dispose of foreign hazardous waste in Louisiana.[32] If a LDEQ permitted facility, such as the ChemWaste facility at Carlyss, disposes of foreign hazardous waste, the LDEQ commission is required to revoke its permit.[33] The plain language of La.R.S. 30:2190 and 30:2191 clearly provides that the State of Louisiana is restricting the movement, storage, and disposal of foreign hazardous waste in Louisiana. Because the Court has found that the foreign hazardous waste involved in this case is an object of commerce, the Louisiana statutes which prohibit its transportation, storage, or disposal in Louisiana are subject to "constitutional scrutiny."[34]

■ The Court must now determine whether Louisiana's prohibition against foreign generated hazardous waste is permissible under the Commerce Clause.[35] In making this determination, the Court shall apply the test set forth by the Supreme Court in *City of Philadelphia*, which provides:

> [W]here simple economic protectionism is effected by the state legislation, a virtually per se rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church, Inc.* [397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)][36]

---

**30.** 910 F.2d at 719 (emphasis in original).

**31.** La.R.S. 30:2190(B) (West 1989) (emphasis added).

**32.** *Id.* § 2191(A).

**33.** *Id.* § 2191(C).

**34.** *City of Philadelphia v. New Jersey,* 437 U.S. 617, 622–23, 98 S.Ct. 2531, 2435, 57 L.Ed.2d 475 (1978); *National Solid Wastes,* 910 F.2d at 719.

**35.** *National Solid Wastes,* 910 F.2d at 719; *Tenneco, Inc. v. Sutton,* 530 F.Supp. 411, 438–39 (M.D.La.1981).

**36.** 437 U.S. at 624, 98 S.Ct. at 2531 (citations omitted); *National Solid Wastes,* 910 F.2d at 719–20. *See also Tenneco,* 530 F.Supp. at 439.

1150

Therefore, the Court must determine whether §§ 2190 and 2191 are "basically a protectionist measure, or whether [they are] based on legitimate local concerns with effects on interstate commerce that are only incidental." [37]

The LDEQ advances several arguments in support of its contention that §§ 2190 and 2191 are constitutional. The LDEQ contends that the purpose of the ban is to protect the citizens of Louisiana from possible health hazards that may arise from contact with unknown contaminants in the foreign generated hazardous waste and thus is valid under the health and safety quarantine power of the state. To support this argument, LDEQ introduced evidence in an attempt to establish: (1) the foreign generator is not subject to the same laws and controls as generators operating in the United States; (2) the Mexican environmental laws have not been sufficiently developed from a technical standpoint to ensure that the type of waste stated on the manifest [38] is actually what is being imported into the state; (3) the Secretariat of Urban Development and Ecology (SUDUE), the Mexican counter part of the EPA, is inadequately staffed to enforce the Mexican environmental laws; and (4) there is no less discriminatory method available.[39]

In response to LDEQ's contention, Chem-Waste argues that the Mexican laws are sufficient to ensure the waste generated in Mexico will not cause health hazards in Louisiana. However, ChemWaste contends that the sufficiency of the Mexican laws is irrelevant because the maquiladoras companies and the Carlyss facility must comply with the United States environmental laws. The Court agrees. Although a major portion of the testimony and evidence presented at the trial concerned the adequacy or inadequacy of the Mexican environmental laws, the Court believes the actual language used in the Louisiana statutes is the core of the constitutional issue now pending before the Court. The statutes enacted by the Louisiana legislature create an irrebuttable presumption concerning the sufficiency of other nation's environmental laws. The irrebuttable presumption leads to a prohibition based solely on the origin of the hazardous waste. An analysis of § 2190 supports this conclusion.

The Louisiana legislature first presumes that foreign nation environmental laws "are inadequate to insure that hazardous wastes sought to be exported to the United States do not contain unknown or unauthorized pollutants and that such wastes are not released into the environment due to inadequate containment, labeling, or handling during transport." [40] Based on this presumption, the legislature concludes that "[t]he only practical method for insuring that the environment and the health of the citizens of this state are not endangered by the importation of hazardous wastes generated in foreign nations is to prohibit the introduction or receipt of such wastes into this state for the purpose of treatment, storage, or disposal." [41]

■ In an apparent attempt to limit scope and constitutional impact of the prohibitions set forth in § 2190, the Louisiana legislature only restricted foreign hazardous waste "imported into this state *directly* from a foreign nation." [42] This restriction has caused much confusion because of the legal and factual dispute regarding the phrase "directly from another nation." The LDEQ contends that by limiting the restriction to hazardous waste imported directly from another nation, there is no unconstitutional burden on interstate commerce under the Commerce Clause. This so called distinction between "direct" and

37. *National Solid Wastes,* 910 F.2d at 720; *see City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2536.

38. The "manifest" is a required form which identifies the quantity, composition, and the origin, routing, and destination of hazardous waste during its transportation from the point of generation to the point of off-site disposal, treatment, or storage.

39. *See Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986).

40. La.R.S. 30:2190(A)(2) (West 1989).

41. *Id.* § 2190(A)(3).

42. *Id.* § 2190(D) (emphasis added).

indirect importation of hazardous waste does not cure the impermissible burden the statute places on interstate commerce.

■ A review of the evidence presented in this case clearly shows that the effect of the statute was to restrict the flow of commerce from Texas to Louisiana. The Court must note that 40 CFR 271.7 requires that when a state seeks have its environmental program operate in lieu of the federal program, e.g., become an "authorized" state, the attorney general of that state must certify to the EPA that the state program is consistent with the federal program. In the certification opinion to the EPA, the Louisiana Attorney General addressed the EPA's concern as to the proper interpretation of the term "directly." The Louisiana Attorney General opined [43] that the restriction only applied to hazardous waste imported directly into Louisiana from a foreign country. He also concluded it was not direct if the waste traveled through another state.[44] Under this interpretation, the LDEQ has misapplied the statutes, causing them to be unconstitutional "as applied."

■ The federal RCRA program allows the importation of foreign hazardous waste.[45] Consequently, foreign generated hazardous waste is legally imported to other states of the United States. The importer of the foreign generated hazardous waste must not only satisfy the federal requirements, but once the waste is legally in the United States, the transporter and disposer are subject to the same environmental laws that are applicable to domestic generated hazardous waste.[46] Therefore, when Louisiana prohibits waste transported from Mexico to Louisiana through Tex-

as, it implicates interstate commerce because the Texas environmental laws concerning transportation apply whether the waste is properly categorized as "directly" or "indirectly" imported.

■ In further support for the Louisiana statutes, LDEQ relies on the "quarantine power" defense. The Eleventh Circuit has recently considered and rejected a similar defense in *National Solid Wastes Management Assoc. v. Alabama Department of Environmental Management.*[47] In *National Solid Wastes,* the Alabama legislature enacted a law which prevented commercial waste management facilities from accepting hazardous waste which was generated in other states unless certain state statutory regulations were met and either preapproval be granted by the State of Alabama, or the waste be pretreated. Alabama argued that the objective of its legislation was to protect the health of its citizens and its environment, not to discriminate against waste generated in other states. However, the Eleventh Circuit, noting that the Alabama law did not prohibit shipments of all hazardous waste but only waste that came from other states, held the statute unconstitutional, stating:

> "[T]he evil of protectionism can reside in legislative means as with as legislative ends." *City of Philadelphia,* 437 U.S. at 626, 98 S.Ct. at 2536–37. Even if Alabama's purpose ... was to protect human health and the environment in Alabama, that purpose "may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Id.* at 626–27, 98 S.Ct. at 2537.[48]

**43.** Usually, the Louisiana Attorney General represents and defends the State of Louisiana when the constitutionality of its laws are being challenged. The Attorney General of Louisiana declined to represent the state in this case even though the constitutionality of La.R.S. 30:2190 and 30:2191 (West 1989) is in question.

**44.** *See* Letter dated Aug. 21, 1984, from Attorney General William J. Guste, Jr. to the EPA, Exhibit 11 of the *Stipulations* (Document 15 in the record).

**45.** 40 CFR 262.60.

**46.** Arguably, if the hazardous waste is of the same type, at this point any distinction between its origin, foreign or domestic, is blurred as the same laws apply.

**47.** 910 F.2d 713 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991).

**48.** *Id.* at 720–21.

1152

In very specific terms, the Eleventh Circuit, relying on *City of Philadelphia,* found that the Alabama law was discriminatory on its face and a protectionist measure because the statute was based solely on the origin of the waste.

In an attempt to circumvent the clear language and mandate of the United States Supreme Court in the *City of Philadelphia* case and to distinguish the holding by the Eleventh Circuit in the Alabama case discussed above, the LDEQ contends that the Louisiana statutes do not ban waste because of its origin, but on the lack of adequate controls by foreign nations.

The problem with LDEQ's argument is that Louisiana's ban is based on the origin of the hazardous waste, rather than on the specific type of hazardous waste. The Louisiana legislature did not provide any exceptions to the absolute ban of foreign generated hazardous waste. The LDEQ was given no authority to consider such factors as the type of waste generated, the foreign country from which the waste originated, or the environmental laws of the foreign country involved and whether such laws were adequate or enforced. The Louisiana laws also fail to give the LDEQ the authority to consider whether the transporter and the in-state facility are subject to enforceable environmental standards, regardless of the generation point of the hazardous waste. Finally, the Louisiana statutes fail to take into consideration any treaties or executive agreements which pertain to the importation of hazardous waste from foreign countries. Simply put, Louisiana's prohibition or barrier is based solely on the fact that the origin of the hazardous waste is from a foreign country.

Although the hazardous waste involved in this case was generated in a foreign country, the Court believes that the legal principles discussed earlier involving domestic waste also apply when a state limits movement based on the origin of the hazardous waste even if the origin is a foreign country. The Court finds that La.R.S. 30:2190 and 30:2191 provide for an absolute ban or prohibition against an object of commerce based solely on its origin. Therefore, the Court finds that §§ 2190 and 2191 are discriminatory on their face, or *per se* discriminatory. Furthermore, the Court finds as a matter of fact and law that the "quarantine power" exception does not apply under the facts of this case.

*B. Foreign Commerce Clause.*

ChemWaste also contends the provisions of La.R.S. 30:2190 and 30:2191 violate the foreign commerce clause.[49] The Congress's plenary power to regulate foreign commerce is well established.[50] The Supreme Court has noted that a higher level of scrutiny is required when foreign commerce is restrained, because, unlike interstate commerce, the United States must speak with a single voice for effective relations and trade with foreign nations.[51] Thus, "[f]oreign commerce is pre-eminently a matter of national concern."[52] Although the Congress's regulatory power over interstate commerce may be limited by federalism and state sovereignty, the Supreme Court has not held that such limitations

49. U.S. Const. art. I, § 8, cl. 3.

50. *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Board of Trustees of Univ. of Ill. v. United States,* 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025 (1933); *Welch v. State Dept. of Highways & Pub. Transp.,* 780 F.2d 1268 (5th Cir.1986), *aff'd,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987); *Meserey v. United States,* 447 F.Supp. 548 (D.Nev.1977).

51. *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 96, 104 S.Ct. 2237, 2245, 81 L.Ed.2d 71 (1984); *Reeves, Inc. v. Stake,* 447 U.S. 429, 437 n. 9, 100 S.Ct. 2271, 2278 n. 9, 65 L.Ed.2d 244 (1980); *Louisiana Land & Exploration v.*

*Pilot Petroleum Corp.,* 900 F.2d 816, 821 (5th Cir.), *cert. denied sub nom., Alabama Dept. of Revenue v. Pilot Petroleum Corp.,* —— U.S. ——, 111 S.Ct. 248, 112 L.Ed.2d 207 (1990); *New Orleans S.S. Assoc. v. Plaquemines Port,* 874 F.2d 1018, 1022–23 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2172, 109 L.Ed.2d 502 (1990).

52. *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 448, 99 S.Ct. 1813, 1821, 60 L.Ed.2d 336 (1979). The Supreme Court noted that "there is evidence that the Founders intended the scope of the foreign commerce power to be the greater [than the other grants of power under the Commerce Clause]." *Id.*

apply to the Congress's power to regulate foreign commerce.[53]

The Congress has expressly authorized in the RCRA regulations the importation of foreign hazardous waste.[54] The State of Louisiana contends that it can prohibit the importation of foreign hazardous waste because the EPA authorized the state to use its program in lieu of the federal provisions. While the state's program has been authorized under the RCRA scheme, the approval by the EPA does not constitute a declaration that the state's program is constitutional or that such approval is binding on the courts or precludes the courts from determining the constitutionality of the statutes. In accordance with the separation of powers doctrine mandated by the Constitution, it is for the courts, and not an executive or legislative body, to determine the constitutionality of the statutes involved in this case.

After reviewing the language of the Louisiana statutes in accordance with the mandates set forth by the Supreme Court, the Court finds that the restrictions placed on the importation of foreign generated hazardous waste, based solely on the origin of an object of commerce, violates the foreign Commerce Clause of the United States Constitution. Thus, since §§ 2190 and 2191 violate the foreign commerce clause, each is unconstitutional.[55]

The Court finds the restrictions created by §§ 2190 and 2191 constitute economic protectionism. Thus, these statutes are discriminatory on their face, or *per se* discriminatory, in violation of the Interstate and Foreign Commerce Clauses of the United States Constitution. The LDEQ has failed to present a legitimate local concern sufficient to overcome the unconstitutional barrier created by the State of Louisiana when it enacted §§ 2190 and 2191.

THEREFORE, for the reasons set forth above:[56]

IT IS ORDERED that Louisiana Revised Statutes 30:2190 and 30:2191 be and each is hereby declared unconstitutional.

IT IS FURTHER ORDERED that a permanent injunction be and it is hereby issued permanently enjoining the defendant, Paul H. Templet, Ph.D., Secretary of the Louisiana Department of Environmental Quality, his successors, agents, and employees, from administering and enforcing Louisiana Revised Statutes 30:2190 and 30:2191.

IT IS FURTHER ORDERED that a copy of the Court's judgment shall be served forthwith on Charles "Buddy" Roemer, Governor of Louisiana, William J. Guste, Jr., Attorney General of Louisiana, and Paul H. Templet, Ph.D., Secretary of the Louisiana Department of Environmental Quality, by the United States Marshal.

Judgment shall be entered accordingly.

53. *Id.* at 448 n. 13, 99 S.Ct. at 1821 n. 13.

54. 40 CFR 262.

55. ChemWaste also contends that §§ 2190 and 2191 are in conflict with the U.S.–Mexican Agreement and Annex III and thus are unconstitutional under the Supremacy Clause. U.S. Const. art. VI, cl. 2. Having found the statutes are unconstitutional under the Commerce Clause, it is not necessary for the Court to discuss or resolve this issue.

56. The Court has considered all of the arguments and contentions of the parties whether specifically discussed in the opinion or not.