3 F.3d 40
 23 Envtl. L. Rep. 21,340
 CIBA-GEIGY CORPORATION and Hercules Incorporated, Petitioner,
v.
Constantine SIDAMON-ERISTOFF, in his official capacity as
Regional Administrator of Region II of the United
States Environmental Protection Agency,
Respondent.
 No. 1413, Docket 92-4129.
 United States Court of Appeals,
Second Circuit.
 Argued May 27, 1993.
Decided Aug. 12, 1993.
 
 Thomas S. West, Albany, NY (Elise N. Zoli, LeBoeuf, Lamb, Leiby & MacRae, on the brief), for petitioner.
 John A. Sheehan, U.S. Dept. of Justice, Washington, DC (Myles E. Flint, Acting Asst. Atty. Gen., Craig D. Galli, U.S. Dept. of Justice, Lawrence E. Starfield, U.S. Environmental Protection Agency, Washington, DC, Stuart N. Keith, U.S. Environmental Protection Agency, New York City, on the brief), for respondent.
 Robert Abrams, Atty. Gen., Joan Leary Matthews, Peter Crary & Val Washington, Asst. Attys. Gen., Albany, NY, filed a letter brief for amicus curiae New York State Dept. of Environmental Conservation.
 Before: NEWMAN, Chief Judge, FEINBERG, Circuit Judge, and KELLEHER,* District Judge.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 This case is before the Court upon the petition of Ciba-Geigy Corporation and Hercules Incorporated (collectively "Ciba"), the current and past operators of a hazardous waste site in Glen Falls, New York, for review of a Memorandum of Agreement between the Environmental Protection Agency and New York State, a decision of the Environmental Appeals Board, and two decisions of the EPA Regional Administrator. In each challenge, Ciba seeks to vindicate a narrow legal point: its contention that EPA cannot administer federal permits for hazardous waste sites in states that have their own federally approved hazardous waste programs under the Hazardous and Solid Waste Amendments ("HSWA") to the Resource Conservation and Recovery Act ("RCRA"). Because we conclude that Ciba has partially failed to exhaust administrative remedies, we dismiss the petition in part. As to the remaining aspects of the petition, we conclude that EPA's construction of RCRA is permissible, and deny the petition.
 
 Background
 
 2
 A brief review of the underlying statutory scheme will be helpful in understanding our disposition of this petition.
 
 A. RCRA permits
 
 3
 RCRA established "a comprehensive 'cradle-to-grave' system for regulating the management of hazardous wastes." 1 Susan M. Cooke, et al., The Law of Hazardous Waste Sec. 1.01 at 1-4 (1993). The statute regulates generators of waste, transporters of waste, and operators of waste treatment, storage, and disposal facilities. See 42 U.S.C.A. Secs. 6922-24 (West 1983 & Supp.1993). Facility operators are required to obtain an operating permit. See 42 U.S.C. Sec. 6925(a) (1988).
 
 
 4
 The statutory scheme contemplates an eventual delegation of permit-issuing authority from EPA to the states. States may submit to the EPA Administrator details of a proposed state hazardous waste program. 42 U.S.C. Sec. 6926(b) (1988). The program must be "equivalent" to the federal RCRA program. Id. Sec. 6926(b)(1). If the Administrator approves the program, the state carries out its program "in lieu" of the federal program. Id. Sec. 6926(b). In particular, the state is responsible for the issuance and administration of permits. Id. However, even after approval of a state program, EPA retains significant involvement. EPA may bring enforcement actions, see 42 U.S.C. Secs. 6928, 6973 (1988), and may inspect and monitor sites, see 42 U.S.C.A. Secs. 6927, 6934 (West 1983 & Supp.1993). See generally Wyckoff Co. v. E.P.A., 796 F.2d 1197, 1200-01 (9th Cir.1986) (EPA may issue order under 42 U.S.C. Sec. 6934 requiring operator to perform monitoring and report results to EPA even after state authorization).
 
 
 5
 The original version of RCRA primarily concentrated on ongoing management of hazardous wastes, and did not provide authority for mandating corrective action to cure past mismanagement of waste. Congress acted to close this gap in 1984 with enactment of HSWA. Among other requirements, HSWA requires that permits for facilities with an existing hazardous waste problem include a schedule for cleaning up the wastes. See 42 U.S.C. Sec. 6924(u)-(v). HSWA also significantly complicated the division of authority between the federal government and the states. Concerned that regulations promulgated under HSWA be implemented as quickly as possible, Congress provided that new federal HSWA regulations would take effect in all states simultaneously, whether or not the state had an approved program under section 6926(b). See 42 U.S.C. Sec. 6926(g)(1) (1988); Cooke Sec. 1.03, at 1-20 to 1-21. If states wish to take over administration of these new regulations, they must amend their hazardous waste programs so as to be "substantially equivalent" to the federal HSWA regulations. Once this amendment is accomplished, the state may apply to the Administrator for "interim authorization ... to carry out [the state] requirement in lieu of direct administration in the State by the Administrator of [the federal] requirement." Id. Sec. 6926(g)(2). Eventually, states wishing to administer these regulations must adopt regulations fully equivalent to federal HSWA regulations, and obtain final authorization for the state HSWA program under section 6926(b).
 
 
 6
 In states that have obtained RCRA authorization under section 6926(b) but have not obtained authorization for HSWA regulations, whether under section 6926(g)(2) or section 6926(b), operators of most hazardous waste sites are required to obtain permits from both the state and EPA. See American Iron and Steel Institute v. U.S. E.P.A., 886 F.2d 390, 403 (D.C.Cir.1989), cert. denied, 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990); Cooke Sec. 5.03, at 5-53 to 5-54. In practice, these dual permits apparently tend to overlap considerably and may even impose conflicting requirements since "[i]t is not uncommon for the state and EPA to have different views on the same substantive issue. When this occurs, the applicant may get whipsawed between the two agencies." See John C. Chambers, Jr. & Peter L. Gray, Intergovernmental Relations: EPA and State Roles in RCRA and CERCLA, Nat. Resources & Env't, July 1989, at 7.
 
 
 7
 The statute does not contain specific provisions concerning the status of existing federal permits after a state obtains HSWA authorization under section 6926(g)(2) or section 6926(b). Under regulations adopted by EPA, the state is required to reissue permits to existing permittees. 40 C.F.R. Sec. 271.13(d).[1] These state RCRA permits contain the requirements of both the previously issued state and federal permits. Id. At some point after issuance of the state RCRA permit, EPA will terminate the previous federal permit. See 40 C.F.R. Sec. 271.8(b)(6).
 
 B. The New York program
 
 8
 By 1986, the New York Department of Environmental Conservation ("DEC") had obtained authorization under section 6926(b), and thus ran the RCRA permitting process in New York. Following enactment of HSWA and the issuance of federal HSWA regulations, DEC adopted new regulations, and applied in September 1991 for authorization to administer these regulations. After a public comment period, the Administrator granted DEC "final authorization" on May 22, 1992.[2]
 
 
 9
 This authorization is reflected in a Memorandum of Agreement ("MOA") between EPA and DEC. The MOA includes provisions that concern the transfer and administration of existing federal permits. It appears to provide that while all pending permit applications will be transferred to DEC, existing federal permits will continue to be administered by EPA. Once DEC issues new permits containing all applicable requirements, EPA will consider termination of the federal permits on a case-by-case basis.C. The pending dispute
 
 
 10
 Ciba owns a paint pigment production facility in Glen Falls, New York. Various waste products were impounded at the site, largely in an open lagoon. In 1989, Ciba decided to close the site, and applied to DEC for an appropriate permit. Because the site contained hazardous wastes and DEC was not yet authorized to administer HSWA regulations, both DEC and EPA issued draft permits. The permits are in large measure identical, because DEC included clean-up requirements, as it had the right to do. Ciba submitted comments requesting that EPA not issue a permit. EPA responded that it could not accede to the request since the DEC permit might not cover all necessary requirements; EPA issued a federal permit in October 1991. Ciba sought review of the federal permit from the EPA Administrator.[3] During the pendency of the review process, the federal permit was automatically stayed. Ciba made two arguments in its review petition. It contended that the federal permit was improper because it substantially duplicated the state permit. It also contended that even if the federal permit could be issued prior to authorization of the New York HSWA program, the federal permit was required to contain an automatic termination provision triggered by state authorization. The Environmental Appeals Board ("EAB") denied the petition in a written opinion. Matter of CIBA-GEIGY Corp., RCRA Appeal No. 91-28 (Apr. 7, 1992). The EAB found (a) that EPA was required to administer the HSWA program prior to state authorization, even if the state had adopted substantially similar requirements and had included those requirements in its permit, and (b) that there was no requirement that the federal permit have an automatic termination provision. The EAB suggested that the termination of the federal permit would be resolved by the MOA between the state and EPA, or otherwise would be resolved by EPA after state authorization. The federal permit accordingly became effective (after some minor delays) on May 8, 1992--some two weeks before New York received authorization to administer its HSWA program. On July 2, 1992, Ciba requested that the Regional Administrator terminate the federal permit in light of the intervening authorization of the New York program. The Regional Administrator did not formally respond. However, counsel to the Regional Administrator stated in a phone call to counsel for Ciba that the Regional Administrator's lack of a response should be treated as a denial of the request.
 
 
 11
 DEC has not yet issued a new post-authorization permit to Ciba. Although EPA has suggested that it would voluntarily terminate the federal permit upon issuance of a new state permit to Ciba, EPA has also indicated that because New York is not authorized to administer 100 percent of HSWA requirements, some type of federal permit might remain necessary to cover those areas in which New York lacks authorization. However, EPA has never identified any specific HSWA requirements relevant to Ciba that only it can enforce.
 
 
 12
 On August 5, 1992, Ciba petitioned this Court pursuant to 42 U.S.C. Sec. 6976(b) (1988) for review of (1) the EAB decision rejecting the petition for review of the October 1991 decision to issue the federal permit, (2) the May 1992 decision of the Regional Administrator to terminate the stay of the permit, (3) the July 1992 refusal of the Regional Administrator to terminate the permit upon request, and (4) the portions of the MOA failing to provide for automatic termination of a federal permit. For relief, Ciba requests that the permit be set aside or that the MOA be modified to provide for termination.
 
 Discussion
 A. Exhaustion
 
 13
 At oral argument, the Court inquired of Ciba whether it had exhausted administrative remedies as to each of the three permitting decisions. We felt obligated to raise the issue sua sponte, since it directly related to the suitability of these matters for judicial review. See Dettmann v. United States Department of Justice, 802 F.2d 1472, 1476 n. 8 (D.C.Cir.1986). After reviewing Ciba's post-argument submission, we have concluded that of the permitting decisions, only the original decision to issue the permit is properly before us.
 
 
 14
 As an initial matter, we believe that there are really only two permitting decisions that Ciba seeks to challenge. This is because the second of the decisions--the Regional Administrator's May 1992 termination of the stay--is not meaningfully distinct from the two other permitting decisions. To the extent Ciba is complaining that the permit should not have been issued initially, that issue is brought before us by the petition for review of the October 1991 decision approved by the EAB. To the extent Ciba is complaining that new evidence--the authorization of New York's HSWA program in late May 1992--required that the permit not be made effective, that issue is presented by the July 1992 request to the Regional Administrator to terminate. The only sense in which the May 1992 decision is distinct from the July 1992 decision is that the Regional Administrator then chose to follow EPA regulations for lifting a stay after a challenged permit was affirmed by the EAB. See 40 C.F.R. Sec. 124.16. We do not understand that Ciba wishes to challenge those regulations.
 
 
 15
 As to the two permitting challenges at issue, we conclude that administrative remedies have been exhausted as to the October 1991 decision but have not been exhausted as to the July 1992 decision. These conclusions stem from two sources. First, the relevant statute authorizes us to review only the "Administrator's action ... in issuing, denying, modifying, or revoking any permit." 42 U.S.C. Sec. 6976(b)(1) (emphasis added). The EAB's decision rejecting Ciba's petition for review of the original issuance of the permit constitutes action of the Administrator. See 40 C.F.R. Sec. 22.04(a). However, the remaining two actions are actions by the Regional Administrator, Constantine Sidamon-Eristoff.
 
 
 16
 Second, EPA has adopted regulations creating express exhaustion requirements. For issuance of a permit, appeal to the EAB is a "prerequisite to the seeking of judicial review of the final agency action." 40 C.F.R. Sec. 124.19(e). Ciba has complied with this requirement. However, Ciba has failed to comply with the parallel requirement for review of the Regional Administrator's refusal to terminate the permit. Such review is provided under 40 C.F.R. Sec. 124.5(b), which allows an "informal appeal" to the Administrator of a Regional Administrator's refusal to terminate a permit. The regulation further provides that "[t]his informal appeal is, under 5 U.S.C. Sec. 704, a prerequisite to seeking judicial review." Id.[4] In its post-argument submission, Ciba argues that 40 C.F.R. Sec. 124.5(b) is inapplicable because it applies only to requests to terminate under 40 C.F.R. Sec. 124.5(a), and the request to terminate the federal permit because of approval of the state program could not have been made under section 124.5(a). We disagree. Section 124.5(a) provides that RCRA permits may be modified or terminated for the reasons specified in 40 C.F.R. Secs. 270.41, 270.43. Section 270.41, in turn, provides that modification requests by the permittee are governed by 40 C.F.R. Sec. 270.42, which allows for modification requests of any type, see id. Sec. 270.42(d). While Ciba appears to be correct that the regulations contemplate termination per se only at the request of EPA, and only for egregious wrongdoing by the permittee, see 40 C.F.R. Sec. 270.43, Ciba's goal of terminating the permit can be achieved by modifying the expiration date of the permit (which is currently November 12, 1996). Accordingly, the proper course for obtaining review of the refusal to terminate is to make a formal request under section 124.5(a) for a modification of the expiration date in compliance with the procedures outlined in section 270.42. If the Regional Administrator rejects the request, an informal appeal to the Administrator should be taken under section 124.5(b). Review would then be available in this Court under 42 U.S.C. Sec. 6976(b)(1).
 
 
 17
 In its post-argument submission, Ciba also argues that EPA, by failing to mention exhaustion in its brief, has waived any defense based on exhaustion. Ciba is correct that under limited circumstances, an agency can waive an exhaustion defense. See Weinberger v. Salfi, 422 U.S. 749, 764-67, 95 S.Ct. 2457, 2466-68, 45 L.Ed.2d 522 (1975); 4 Kenneth C. Davis, Administrative Law Treatise Sec. 26:8, at 445 (1983). In Salfi, the Supreme Court reviewed the constitutionality of a Social Security Administration decision denying survivor's benefits to a widow on the ground she had been married to the deceased for less than nine months before his death. Although the petitioner had clearly not exhausted her claim within the agency, the Court found review appropriate because the Secretary had not raised an exhaustion defense, the applicant had presented "her claim at a sufficiently high level of review to satisfy the Secretary's administrative needs," and the Secretary had determined that "the only issue is the constitutionality of a statutory requirement, a matter which is beyond his jurisdiction to determine," and that the claim was otherwise valid. Salfi, 422 U.S. at 765, 95 S.Ct. at 2467. We believe that Salfi is distinguishable and that additional agency review would be quite helpful. The regulatory scheme is complex, the agency must construe both the statute and its own regulations, and no severable constitutional issue is presented.
 
 B. Ripeness
 
 18
 EPA contends that the two remaining challenges--to the original permitting decision and to the MOA--are not ripe for adjudication by this Court. EPA points out that Ciba has identified no inconsistency between the state and federal permits and does not object to any specific decision requiring it to take any particular action in operating or cleaning up the site. Because Ciba seeks only to avoid the possibility of some future dispute, EPA asks that we dismiss the remaining portions of the petition as non-justiciable.
 
 
 19
 EPA relies on decisions under the Administrative Procedure Act that provide that agency action is not ripe unless the issue presented (i) is fit for judicial determination, in the sense that further factual development would not be helpful, and (ii) the withholding of court consideration would cause a hardship. See Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). Arguably, decisions like Abbott Laboratories have limited relevance to Ciba's challenges, since RCRA specifically authorizes review in the Court of Appeals of the "Administrator's action (1) in issuing, denying, modifying, or revoking any permit under section 6925 ..., or (2) in granting, denying, or withdrawing authorization or interim authorization under section 6926." 42 U.S.C. Sec. 6976(b). Thus, this may be a situation in which "Congress explicitly provides for our correction of the administrative process at a higher level of generality," see Lujan v. National Wildlife Federation, 497 U.S. 871, 894, 110 S.Ct. 3177, 3191, 111 L.Ed.2d 695 (1990), than the usual ripeness test demands. But see W.R. Grace & Co.--Conn. v. U.S. E.P.A., 959 F.2d 360, 364-67 (1st Cir.1992) (applying general test of ripeness to permit dispute reviewable under 42 U.S.C. Sec. 6976(b)(1)).
 
 
 20
 Even under the general test, however, we believe that the original permitting decision reviewed by the EAB is ripe for review. As to fitness, the issue is fairly well developed. We are well past the point where the agency has merely taken the position that it has the power to issue duplicative federal permits. Rather, the agency has issued the duplicative permit. In contrast to W.R. Grace & Co.--Conn. v. U.S. E.P.A., 959 F.2d 360 (1st Cir.1992), in which the First Circuit declined to review a dispute over the mode of review of EPA modifications to a permit prior to the proposal of any actual modifications, it is difficult to see in this case how further factual development would make the legal question more fit for judicial review. See Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 81-82, 98 S.Ct. 2620, 2634-35, 57 L.Ed.2d 595 (1978); American Petroleum Institute v. U.S. E.P.A., 906 F.2d 729, 739 (D.C.Cir.1990) ("a 'purely legal question' ... is 'presumptively reviewable' "). As to hardship, Ciba points out that even if the federal permit does not impose different substantive requirements, it imposes burdensome procedural requirements. Ciba will be required to submit additional copies of all its plans, and await the approval of EPA before it can perform remediation activity. Whether duplicate filing obligations alone would suffice to warrant judicial review is debatable, but the need to await agency approval before taking action entitles Ciba to secure review of the agency's assertion of jurisdiction. That this dispute can grow worse does not mean that hardship does not exist now. See Central Hudson Gas & Electric Corp. v. U.S. E.P.A., 587 F.2d 549, 558-60 (2d Cir.1978) (finding ripe EPA's assertion of jurisdiction to issue Clean Water Act permit, despite authorization of state program, prior to issuance of federal permit); Sayles Hydro Associates v. Maughan, 985 F.2d 451, 453-454 (9th Cir.1993) (federally licensed dam operator could challenge state permitting requirement on preemption grounds without awaiting state's imposition of inconsistent requirements under its permit); see generally Natural Resources Defense Council, Inc. v. U.S. E.P.A., 859 F.2d 156 (D.C.Cir.1988) (in some cases, regulations requiring certain conditions in permits are ripe for review even before issuance of permits).
 
 
 21
 EPA also contends that Ciba's challenge to the MOA is not ripe. However, EPA's actual argument appears to be a standing argument: that Ciba may not challenge the MOA because it "has no impact on Ciba's conduct." EPA Brief at 23. EPA does not appear to contemplate that Ciba would be able to challenge the MOA itself at a later date. Instead, EPA insists that Ciba must await specific action by some agency under the MOA, and then may challenge that action. While we agree with EPA that any injury suffered by Ciba as a result of the MOA is slight, RCRA authorizes "any interested person" to challenge EPA's action in "granting, denying, or withdrawing authorization or interim authorization under section 6926." 42 U.S.C. Sec. 6976(b). The MOA is the means by which EPA grants authorization under section 6926. See 40 C.F.R. Secs. 271.8, 271.126. We do not believe that standing is lacking in a constitutional sense, since Ciba has suffered at least the minimal injury of being subjected to dual approval requirements and duplicative submission requirements, and because a change in the MOA would remedy Ciba's slight injury.
 
 C. Merits
 
 22
 Ciba's surviving challenges on the merits present extremely narrow questions: whether EPA must include an automatic termination provision, triggered by state authorization, in pre-authorization federal permits, and whether an MOA must provide for the immediate termination of pre-existing federal permits. It is important to recognize what is not before us: the permissibility of EPA's general policy of continued administration, and perhaps issuance, of federal permits in authorized states. Most of Ciba's arguments are devoted to that question, a particularly difficult question since the lack of exhaustion has failed to make completely clear what EPA's position is on this question.[5] However, we will consider in turn each of Ciba's arguments as they apply to the narrow questions before us.
 
 
 23
 1. Judicial estoppel. Ciba's first argument is judicial estoppel. This argument rests on the contention that EPA took a position inconsistent with its current position in two District Court cases, Chemical Waste Management, Inc. v. Templet, 770 F.Supp. 1142 (M.D.La.1991), aff'd, 967 F.2d 1058 (5th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1048, 122 L.Ed.2d 357 (1993), and Thompson v. Thomas, 680 F.Supp. 1 (D.D.C.1987). This argument is unavailing. EPA was not even a party to the Chemical Waste Management case. In the Thompson case, which involved an attempt to force EPA to take discretionary enforcement actions against a dump, EPA argued that such a suit was not authorized by RCRA. The Court agreed, and suggested that the plaintiffs could bring a state court action against the dump in Wisconsin, since Wisconsin was an authorized state. Whatever consequence EPA's action in this litigation might have for EPA's broad policy on post-authorization administration, it is not at all relevant to either the question of whether a federal permit must include an automatic termination provision or the question of whether an MOA must provide for immediate termination of a federal permit upon issuance of a state permit.
 
 
 24
 2. Inconsistency with regulations. Ciba next argues that EPA's position is inconsistent with 40 C.F.R. Sec. 271.8(b)(6), which provides:
 
 
 25
 When existing permits are transferred from EPA to the State for administration, the Memorandum of Agreement shall contain provisions specifying a procedure for transferring the administration of these permits. If a State lacks the authority to directly administer permits issued by the Federal government, a procedure may be established to transfer responsibility for these permits.
 
 
 26
 NOTE: For example, EPA and the State and the permittee could agree that the State would issue a permit(s) identical to the outstanding Federal permit which would simultaneously be terminated.
 
 
 27
 Ciba contends that by adoption of this regulation, EPA committed itself to including termination provisions in federal permits and to immediately terminating federal permits upon state authorization. The simple answer is that this is not what the regulation says. The regulation says nothing about the content of permits. As to MOAs, the regulation requires only that they contain provisions for transfer of existing permits; the content of those provisions is left open. The Note appended to the end of the section only suggests one method. There can be no doubt that the MOA has provisions governing the transfer of existing permits.[6] Ciba just does not like those provisions. Moreover, other regulations adopted by EPA clearly contemplate the continued administration of federal permits after state authorization, at least to the point where the state issues a new state permit. See, e.g., 40 C.F.R. Sec. 270.51(d).
 
 
 28
 3. Impermissible construction of RCRA. Finally, Ciba contends that EPA's position is impermissible under the statute. The parties agree that resolution of this question is governed by Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, Ciba may prevail only by showing that EPA's resolution of the issues is directly contrary to congressional intent, or that the statute is silent on the issues and the agency's resolution is unreasonable. Ciba devotes most of its brief to arguing under the first prong of Chevron. Section 6926(g)(2), which governs interim HSWA authorization, provides that
 
 
 29
 The Administrator shall, if the evidence submitted shows the State requirement to be substantially equivalent to the [federal requirement], grant an interim authorization to the State to carry out such requirement in lieu of direct administration in the State by the Administrator of such requirement. [Emphasis added.]
 
 
 30
 Virtually identical language appears in section 6926(b), which governs final authorization. Ciba contends that the emphasized language means that after state authorization, the federal program is entirely displaced and EPA must immediately terminate or transfer any existing permits.
 
 
 31
 Whatever this statutory language might signify for EPA's general policies on permit administration, it does not speak to the questions before the Court. The "direct administration" language cannot be read to specify any particular procedure for termination of federal permits, whether by an automatic termination provision in the permit or an immediate termination provision in the MOA, and does not specify any time limit by which federal involvement must cease.
 
 
 32
 We thus reach the second prong of Chevron. Ciba must show that EPA's interpretation fails a highly deferential reasonableness test, applied with due regard to the statutory purpose. Congress' primary purpose in adopting RCRA and HSWA was protection of the environment and public health. While delegation to states was also an important purpose, EPA's refusal to include a termination provision in the original permit and its refusal to provide for immediate termination of federal permits cannot be said to be unreasonable. Continued administration of federal permits past the immediate moment of state authorization avoids the gap in regulation that might occur if the state failed to immediately issue a new permit containing all applicable requirements, and allows the state and federal regulators the opportunity to coordinate in an effective manner a gradual transfer of jurisdiction. See Central Hudson Gas & Electric Corp. v. U.S. E.P.A., 587 F.2d 549, 561-62 (2d Cir.1978) (reasonable for EPA to issue federal permits under Clean Water Act, notwithstanding authorization of state permitting program, so as to "allow[ ] for the smooth transition from federal to state permit program").[7]
 
 Conclusion
 
 33
 Ciba's petition for review of the July 1992 refusal to terminate the federal permit and of the May 1992 decision to terminate a stay of the federal permit is dismissed for failure to exhaust administrative remedies. The petition for review of the October 1991 issuance of the permit approved by the EAB in April 1992 and of the May 1992 MOA between EPA and New York is denied.
 
 
 
 *
 The Honorable Robert J. Kelleher of the United States District Court for the Central District of California, sitting by designation
 
 
 [1]
 All C.F.R. cites are to the July 1, 1992, edition
 
 
 [2]
 It is not entirely clear from the record whether the May 1992 authorization constituted interim authorization under 42 U.S.C. Sec. 6926(g)(2), as Ciba contends, or whether it constituted final authorization of the state HSWA program under 42 U.S.C. Sec. 6926(b), as EPA contends. We suspect that EPA is correct, since the federal register notice identifies the proposed action as "final authorization," see 57 Fed.Reg. 9978 (Mar. 23, 1992), and since interim authorization would have expired on January 1, 1993, see 40 C.F.R. Sec. 271.24(c). As will become clear in our later discussion, however, it makes no difference under which section New York has been authorized
 
 
 [3]
 EPA regulations provide that the Administrator may review permit decisions by Regional Administrators. See 40 C.F.R. Sec. 124.19. Prior to February 13, 1992, this authority was exercised by the Administrator directly in concert with the Agency Judicial Officer. On February 13, 1992, the position of Agency Judicial Officer was abolished, and the Environmental Appeals Board was created to exercise the Administrator's review authority. See 40 C.F.R. Sec. 22.04(a). The Board consists of three environmental judges. Ciba's petition was filed with the Agency Judicial Officer and determined by the Environmental Appeals Board
 
 
 [4]
 The mandatory exhaustion language contained in this regulation distinguishes this case from Darby v. Cisneros, --- U.S. ----, 113 S.Ct. 2539, 125 L.Ed.2d 113 (U.S.1993), in which a Housing and Urban Development Department regulation provided that parties "may request" administrative review of the decision of a hearing officer, and contained no language identifying this review as a prerequisite to judicial review. In such a case, the Supreme Court held that section 10(c) of the Administrative Procedure Act, 5 U.S.C. Sec. 704 (1988), prohibits courts from engrafting additional exhaustion requirements. Here, in contrast, agency rule, and not judge-made doctrine, is the source of the exhaustion requirement
 
 
 [5]
 While it is clear that EPA believes it may continue to administer pre-authorization federal permits in authorized states, the exact contours of EPA's position are far from clear. What might be called EPA's minimum position is that it may administer federal permits in authorized states until the time the state issues a new permit incorporating HSWA regulations. EPA's maximum position is that it may issue and administer federal permits in authorized states at any time during which, as will inevitably occur, the state has lagged behind EPA in issuing new hazardous waste regulations. Under this approach, the right of EPA to issue and enforce permits would come and go as a regulatory gap opens and closes between state regulations and EPA regulations
 
 
 [6]
 Specifically, Section VI of the MOA provides that EPA will terminate federal permits "[w]hen the state either incorporates the terms and conditions of the federal permits in the State RCRA permits or issues State RCRA permits to those facilities." Section V of the MOA also provides that "[w]henever EPA adds permitting standards for processes not currently covered by State regulations, EPA will process and enforce HSWA permits in the new areas until the State receives final authorization for these standards."
 
 
 [7]
 Ciba also relies on several decisions more relevant to the question of the permissibility of EPA's general policies on permit administration. See Northside Sanitary Landfill, Inc. v. Thomas, 804 F.2d 371, 381-82 (7th Cir.1986) (EPA may not issue new permits in authorized states when those permits concern only those regulations the state is authorized to administer); Dague v. City of Burlington, 935 F.2d 1343, 1348-49 (2d Cir.1991) (dicta indicating that individuals may not bring direct actions in federal court under 42 U.S.C. Sec. 6972(a) to enforce RCRA regulations after state authorization, but must bring those actions in state court), rev'd on other grounds, --- U.S. ----, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). These decisions are not helpful in resolving the very narrow issues before the Court