OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS

May 18, 1999

The Honorable Gary L. Walker
Chair, Land & Resource
   Management Committee
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. JC-0052

Re: Whether development of an assured-isolation facility for low-level radioactive waste would satisfy the requirements of the Texas Low-Level Radioactive Waste Disposal Compact, and whether a law enacted for the purpose of precluding private disposal facilities from accepting waste generated by the U.S. Department of Energy would be valid (RQ-0033)

Dear Representative Walker:

You ask two questions regarding the disposal of low-level radioactive waste in Texas. First, you ask whether a law requiring the development of an assured-isolation facility for low-level radioactive waste would satisfy the state's obligations under the Texas Low-Level Radioactive Waste Disposal Compact. We conclude that development of an assured-isolation facility would comply with the state's current obligations under the Compact to manage and to provide for the disposal of Compact waste. Assured isolation would not currently satisfy the state's obligation under the Compact to permanently dispose of the waste. Whether assured isolation will ultimately develop into an option for the disposal of low-level radioactive waste, and thereby satisfy the Compact, depends on a variety of factors and circumstances that we cannot predict.

Second, you ask whether a law adopted for the purpose of precluding a private company from contracting for the disposal at a private site within Texas of low-level radioactive waste generated by the United States Department of Energy ("DOE") would be valid. We conclude that a law adopted for such a purpose would violate the Supremacy Clause and the Commerce Clause of the United States Constitution. But we also conclude that the existing law which, because of current federal policy, has the effect of precluding DOE waste disposal at private facilities, is constitutional.

We note as a preliminary matter that we are well aware of the history of the issues raised by your questions and of the complexity of the federal and state laws governing them. We are also aware that law and policies are developing on these issues even as we write. But in the interest of expediting our response, as you have requested, we will address only the questions you ask and explore only those issues necessary to the response. As you may know, various federal and state agencies and interested private parties have written extensively on these topics, and we refer you to

them for thorough discussions of the issues. *See, e.g.*, U.S. DEP'T OF ENERGY, COMMERCIAL DISPOSAL POLICY ANALYSIS FOR LOW-LEVEL & MIXED LOW-LEVEL WASTES ES-2 (Mar. 9, 1999); Donald J. Silverman & Michael A. Bauser, U.S. DEP'T OF ENERGY, LICENSING AN ASSURED ISOLATION FACILITY FOR LOW-LEVEL RADIOACTIVE WASTE (July 1998); FRANK H. SANTORO, ESQ., ASSURED ISOLATION LEGAL STUDY (Mar. 10, 1999) (prepared for Connecticut Hazardous Waste Management Service); William F. Newberry, Thomas A. Kerr & David H. Leroy, *Assured Storage Facilities: A New Perspective on LLW Management*, RADWASTE, Sept. 1995, at 13; William F. Newberry, Thomas A. Kerr & David H. Leroy, *Assured Storage Integrated Management Systems: The Most Frequently Asked Questions*, RADWASTE, Sept. 1996, at 20.

Finally, we do not intend this opinion to advocate the adoption or rejection of the proposals about which you ask. Whether to enact legislation is a policy decision to be made by the legislature. We turn now to your questions.

I.      Question One: Would development of an assured-isolation facility satisfy the requirements of the Texas Low-Level Radioactive Waste Disposal Compact?

You ask whether the development in Texas of an assured-isolation facility for low-level radioactive waste would satisfy the state's obligations under the Texas Low-Level Radioactive Waste Disposal Compact. We conclude that development of an assured-isolation facility would at least satisfy the state's current obligations to manage and to provide for the disposal of Compact waste.

A.      Assured Isolation of Radioactive Waste.

The concept of assured isolation is well known in the field of radioactive waste disposal. Assured isolation has been proposed as a method for dealing with the need for radioactive waste disposal facilities, a need that has been described by the United States Supreme Court:

> We live in a world full of low level radioactive waste. Radioactive material is present in luminous watch dials, smoke alarms, measurement devices, medical fluids, research materials, and the protective gear and construction materials used by workers at nuclear power plants. Low level radioactive waste is generated by the Government, by hospitals, by research institutions, and by various industries. The waste must be isolated from humans for long periods of time, often for hundreds of years. Millions of cubic feet of low level radioactive waste must be disposed of each year.

*New York v. United States*, 505 U.S. 144, 149-50 (1992). Assured isolation of radioactive waste is proposed as an alternative to traditional, underground burial because attempts to build traditional disposal sites have met with opposition and have failed, largely because of concerns of underground contamination. *See* William F. Newberry, Thomas A. Kerr & David H. Leroy, *Assured Storage*

*Facilities: A New Perspective on LLW Management*, RADWASTE, Sept. 1995, at 13. No new traditional low-level radioactive waste disposal sites have been established in the United States in over twenty-five years. *Id.*

The originators of the concept of assured isolation define it as "an integrated management system for safely housing waste, while preserving options for its long-term management through robust, accessible facilities, planned preventive maintenance, [and] sureties adequate to address contingencies or implement future alternatives." *See* William F. Newberry, Thomas A. Kerr & David H. Leroy, *Assured Storage Integrated Management Systems: The Most Frequently Asked Questions*, RADWASTE, Sept. 1996, at 20, 21. Its essential physical features are above-ground, concrete-encased modules that are easily accessible for maintenance and inspection, and from which the waste can be removed. *Id.* at 20. An analysis of assured-isolation facilities published by the United States Department of Energy describes an assured-isolation facility as an above-ground "robust engineered facility in which LLW is isolated for an indefinite period of time." 1 Donald J. Silverman & Michael A. Bauser, U.S. DEP'T. OF ENERGY, LICENSING AN ASSURED ISOLATION FACILITY FOR LOW-LEVEL RADIOACTIVE WASTE, at 3 (July 1998). These commonly understood notions of assured isolation inform our answers to your questions.

B.    The Texas Low-Level Radioactive Waste Disposal Compact.

"Faced with the possibility that the Nation would be left with no disposal sites for low level radioactive waste, Congress responded by enacting the Low-Level Radioactive Waste Policy Act." *New York v. United States*, 505 U.S. at 150. The Low-Level Radioactive Waste Policy Amendments Act of 1985 declares that "[e]ach State shall be responsible for providing, either by itself or in cooperation with other States, for the disposal of low-level radioactive waste generated within the State," with the exception of certain types of waste generated by the federal government. 42 U.S.C. § 2021c(a) (1994). The Act declares that the states' responsibility for disposal "can be most safely and effectively managed on a regional basis." *Id.* § 2021d(a)(1). In accordance with this policy, the Act allows states to enter into compacts to provide for the establishment and operation of regional disposal facilities for low-level radioactive waste, and provides incentives for doing so. *Id.* § 2021d(a)(2). Compacts, to be effective, must be approved by Congress. *Id.* § 2021d(c)(2).

Texas entered into a compact with Maine and Vermont. *See* TEX. HEALTH & SAFETY CODE ANN. § 403.006 (Vernon Supp. 1999). The Compact was approved by Congress. *See* Texas Low-Level Radioactive Waste Disposal Compact Consent Act, Pub. L. No. 105-236, 112 Stat. 1542 (1998). Texas, as the host state, must receive and dispose of radioactive waste from the Compact states. TEX. HEALTH & SAFETY CODE ANN. § 403.006, art. II, § 2.01(8) (Vernon Supp. 1999). "The host state shall develop and have full administrative control over the development, management, and operation of a facility for the disposal of low-level radioactive waste generated within the party states." *Id.* art. IV, § 4.01. The host state must "[c]ause a facility to be developed in timely manner and operated and maintained through the institutional control period." *Id.* art. IV, § 4.04(1). You ask whether development of an assured-isolation facility would satisfy Texas's obligations as host state under the Compact.

As an interstate compact approved by Congress, the Texas Compact is subject to interpretation under federal law. *See Cuyler v. Adams*, 449 U.S. 433, 438, 442 (1981); *Nebraska v. Central Interstate Low-Level Radioactive Waste Comm'n*, 902 F. Supp. 1046, 1049 (D. Neb. 1995); *Johnson v. State*, 900 S.W.2d 475, 479 (Tex. App.–Beaumont 1995), *aff'd as modified*, 930 S.W.2d 589 (Tex. Crim. App. 1996) (en banc). No federal court that we are aware of has answered your question.

We begin by looking at the express terms of the Compact. The Compact provides that it "shall be broadly construed to carry out the purposes of the compact, but the sovereign powers of a party shall not be infringed upon unnecessarily." TEX. HEALTH & SAFETY CODE ANN. § 403.006, art. VIII, § 8.01 (Vernon Supp. 1999). The Compact contemplates the permanent disposal of radioactive waste. It provides that the host state "shall develop . . . a facility for the *disposal* of low-level radioactive waste." *Id.* art. IV, § 4.01 (emphasis added). "Disposal" under the Compact means "the *permanent isolation* of low-level radioactive waste pursuant to requirements established by the United States Nuclear Regulatory Commission and the United States Environmental Protection Agency under applicable laws, or by the host state." *Id.* art. II, § 2.01(4) (emphasis added).

The federal Low-Level Radioactive Waste Policy Amendments Act of 1985 also speaks in terms of the disposal of low-level radioactive waste: "Each state shall be responsible for providing . . . for the *disposal* of . . . low-level radioactive waste." 42 U.S.C. § 2021c(a) (1994) (emphasis added). "Disposal" under the federal Act means "the *permanent isolation* of low-level radioactive waste pursuant to the requirements established by the Nuclear Regulatory Commission under applicable laws, or by an agreement State if such isolation occurs in such agreement State." *Id.* § 2021b(7) (emphasis added). Thus, both the Act and the Compact require Texas to develop a facility for the disposal of waste, with disposal meaning the *permanent* isolation of waste.

"Permanent" is not defined by the Compact or by statute. Ordinarily it means: "Continuing or designed to continue indefinitely without change; abiding, lasting, enduring; persistent. Opposed to *temporary*." XI THE OXFORD ENGLISH DICTIONARY 574 (2d ed. 1989). Under the current federal regulatory scheme for the disposal of radioactive waste, with which Texas law must be consistent, a facility for the permanent disposal of radioactive waste is an underground facility licensed by the federal Nuclear Regulatory Commission ("NRC") under Part 61 of Title 10 of the Code of Federal Regulations. The regulations require long-term stability of the waste, its containers, and the site in order to minimize migration of waste until the radionuclides have decayed to harmless levels. 10 C.F.R. § 61.7(b)(2) (1998). The requirements include protection for "inadvertent intruders" during that time, which might be 100 to 500 years, depending on the type of waste. *Id.* § 61.7(b)(3)-(5). Site characteristics are considered for the "indefinite future" and formally evaluated for "at least a 500-year time frame." *Id.* § 61.7(a)(2).

An essential feature of assured isolation is that it enables waste to be retrieved. *See* William F. Newberry, Thomas A. Kerr & David H. Leroy, *Assured Storage Integrated Management Systems: The Most Frequently Asked Questions*, RADWASTE, Sept. 1996, at 20, 21. For example, some wastes

with relatively short half-lives might be suitable for traditional underground disposal after ten years or so, and thus may be removed from the assured-isolation facility and disposed of elsewhere. And some wastes may have intrinsic value and may be removed from the facility and sold. The fact that assured isolation contemplates that the waste may be retrieved suggests that assured isolation is not the *permanent* isolation of waste.

Indeed, the NRC has taken the position that assured storage is not permanent disposal under 10 C.F.R. Part 61: "We do not consider assured storage to be the equivalent of permanent disposal of LLW. By its very nature, assured storage is considered a temporary facility." Letter from Shirley Ann Jackson, Chair, United States Nuclear Regulatory Commission, to the Honorable Gary L. Walker, Texas House of Representatives (Mar. 19, 1999) (on file with Opinion Committee) [hereinafter NRC letter of 3/19/99]. Texas may not, consistent with federal law, license an assured-isolation facility as a means of permanent disposal for low-level radioactive waste. Consequently, assured isolation would not currently satisfy the state's obligation to dispose of Compact waste.

It is possible, however, that assured isolation of low-level radioactive waste might ultimately result in its permanent disposal in the same facility. A study of the assured-isolation concept published by the United States Department of Energy describes ways in which disposal of waste in an assured-isolation facility might result in permanent disposal there. A facility could be converted to a permanent disposal facility after the waste has decayed to a level where it no longer needs to be monitored. This could be done, for example, by covering the facility with earth. *See* 1 Donald J. Silverman & Michael A. Bauser, U.S. DEP'T OF ENERGY, LICENSING AN ASSURED ISOLATION FACILITY FOR LOW-LEVEL RADIOACTIVE WASTE 7 (July 1998). Thus, while assured isolation might not result in permanent disposal in the short term, it remains to be seen whether assured isolation could in fact ultimately result in permanent disposal of the waste.

While we cannot determine whether the development of an assured-isolation facility will ultimately satisfy the state's obligation under the Compact to *dispose* of low-level radioactive waste, we believe it does satisfy the state's obligation to *manage* and to *provide for* the disposal of low-level radioactive waste. The Low-Level Radioactive Waste Policy Amendments Act of 1985 makes states responsible for "*providing . . . for* the disposal of low-level radioactive waste." 42 U.S.C. § 2021c(a) (1994) (emphasis added). Construing the meaning of the phrase "provide for the disposal of" in another part of the Act, federal courts have held that "provide for" means "taking some affirmative step to supply, afford, or furnish means to dispose of" waste. *See Appalachian States Low-Level Radioactive Waste Comm'n v. Peña*, 126 F.3d 193, 198 (3rd Cir. 1997); *Central Midwest Interstate Low-Level Radioactive Waste Comm'n v. Peña*, 113 F.3d 1468, 1473-74 (7th Cir. 1997).

Assured isolation is commonly viewed as a step leading toward permanent disposal. For example, a federal study of assured isolation describes the possibility that low-level waste, after it has decayed somewhat, will be transferred to a more appropriate disposition site. *See* 1 Donald J. Silverman & Michael A. Bauser, U.S. DEP'T OF ENERGY, LICENSING AN ASSURED ISOLATION FACILITY FOR LOW-LEVEL RADIOACTIVE WASTE 7 (July 1998). Thus, it can be argued that assured

isolation, even if not permanent, *provides for* the permanent disposal of waste because at least it provides for the temporary isolation of waste until a permanent disposal solution is developed.

Moreover, the Compact contemplates the *management* of waste in addition to disposal, suggesting that isolation other than "permanent" isolation, as might be contemplated by permanent underground burial, is permissible under the Compact. The Compact speaks of both the management and disposal of waste in describing its purpose:

> Sec. 1.01. The party states recognize a responsibility for each state to seek to *manage* low-level radioactive waste generated within its boundaries . . . . They also recognize that the United States Congress, by enacting the Act, has authorized and encouraged states to enter into compacts for the efficient *management and disposal* of low-level radioactive waste. It is the policy of the party states to cooperate in the protection of the health, safety, and welfare of their citizens and the environment and to provide for and encourage the economical *management and disposal* of low-level radioactive waste. It is the purpose of this compact to . . . limit the number of facilities needed to effectively, efficiently, and economically *manage* low-level radioactive waste . . . .

TEX. HEALTH & SAFETY CODE ANN. § 403.006, art. I, § 1.01 (Vernon Supp. 1999) (emphasis added) (citation omitted). The Compact also provides that the host state must "[c]ause a *facility* to be developed in a timely manner and operated and maintained through the institutional control period." *Id.* art. IV, § 4.04(1). "Compact facility" means "any site, location, structure, or property located in and provided by the host state for the purpose of *management or disposal* of low-level radioactive waste." *Id.* art. II, § 2.01(3) (emphasis added). "Management" itself is defined in the Compact as "collection, consolidation, *storage*, packaging, or treatment." *Id.* art. II, § 2.01(11). Thus, it can be said that assured isolation, which is considered as the management of waste, comports with the Compact's requirement to develop, in a timely manner, a facility for the management of waste.

C.    Conclusion.

Viewing the Compact broadly in order to carry out its purposes, we conclude that development of an assured-isolation facility complies with the state's current obligations to manage and to provide for the disposal of Compact waste. Because assured isolation does not effect a method of permanent isolation or disposal of low-level radioactive waste, it would not currently satisfy the state's obligation under the Compact to dispose of Compact waste. Whether assured isolation will ultimately become a legally viable option for the disposal of such waste remains to be seen.

II.    Question Two: Would a law adopted for the purpose of precluding a private company from contracting for the disposal at a private site within Texas of low-level radioactive waste generated by DOE be valid?

Your second question is whether a law adopted for the purpose of precluding a private company from contracting for the disposal at a private site within Texas of low-level radioactive waste generated by the United States Department of Energy would be valid. Because the answer to this question depends at least in part upon the legislature's rationale for such a statute and the statute's express terms, in the absence of legislation, we cannot do a full analysis of its potential validity. But it is our opinion that a law adopted for the purpose of precluding private parties from accepting DOE waste would contravene the United States Constitution. On the other hand, we conclude that the existing law which, because of current federal policy, effectively precludes DOE waste disposal at private facilities, is constitutional.

A.    Federal regulation of DOE waste.

The Low-Level Radioactive Waste Policy Amendments Act of 1985, discussed above, makes the federal government responsible for the disposal of low-level radioactive waste owned or generated by DOE. 42 U.S.C. § 2021c(b)(1) (1994). A Compact state may exclude DOE waste from being disposed of at a Compact facility. *Id.* § 2021c(a)(1)(B)(i). Texas has chosen statutorily not to exclude DOE waste from a Compact facility. On the contrary, the Compact specifically allows the Texas Low-Level Radioactive Waste Disposal Compact Commission to agree to import waste from outside the Compact for management or disposal in a Compact facility. TEX. HEALTH & SAFETY CODE ANN. § 403.006, art. III, § 3.05(6) (Vernon Supp. 1999). Neither the federal Act nor the Compact speaks to disposal of DOE waste in private, non-Compact facilities within the state.

The federal Atomic Energy Act of 1954 authorizes the Nuclear Regulatory Commission to issue licenses for radioactive waste disposal sites and to exempt certain activities from licensing. 42 U.S.C. § 2111 (1994). It also allows the NRC by agreement to withdraw from regulating in a given state and let the state license and regulate radioactive waste disposal under state law. *Id.* § 2021(b). Texas, which has laws regulating radioactive materials, *see generally* TEX. HEALTH & SAFETY CODE ANN. chapter 401 (Vernon 1992 & Supp. 1999), has entered into such an agreement, *see* Notice of Discontinuance of Certain Regulatory Authority and Responsibility within the State of Texas, 47 Fed. Reg. 15,186 (Apr. 8, 1982).

Under Texas law, "[a] radioactive waste disposal license may be issued only to a public entity specifically authorized by law for radioactive waste disposal." TEX. HEALTH & SAFETY CODE ANN. § 401.203 (Vernon Supp. 1999). "Thus, a private commercial waste disposal facility company is barred by state law from obtaining a license in Texas for the disposal of LLRW." *Waste Control Specialists, Inc. v. United States Dep't of Energy*, 141 F.3d 564, 566 (5th Cir. 1998).

With regard to low-level radioactive waste generated by the United States Department of Energy, additional considerations apply. The NRC has adopted a rule exempting from NRC

licensing requirements "any prime contractor of the Department [of Energy] . . . to the extent that such contractor . . . transfers, receives, acquires, owns, possesses, or uses byproduct material [which includes low-level radioactive waste] for [t]he performance of work for [DOE] at a United States Government-owned or controlled site." 10 C.F.R. § 30.12(a) (1998). "The phrase 'Government controlled site' means a site leased or otherwise made available to the Government under terms which afford to the Commission rights of access and control substantially equal to those which the Commission would possess if it were the holder of the fee as agent of and on behalf of the Government." 29 Fed. Reg. 14,401 (1964). In other words, under federal law, a private disposal company contracting with DOE to dispose of DOE waste at a federally-owned site need not be licensed by the NRC.

It may also be true that a private company disposing of DOE waste at a *privately-owned* site controlled by DOE is exempt from NRC, and thus state, licensing requirements. The Fifth Circuit Court of Appeals said as much in *Waste Control Specialists*: "If DOE chooses to regulate, or 'control,' the private waste disposal sites, then the sites are exempt from NRC and state licensing requirements." *Waste Control Specialists*, 141 F.3d at 568. These issues were not points in dispute in the case, however. *See id.* at 567 ("Both sides agree that WCS's proposal for DOE regulation of the site could lawfully be implemented.").

In sum, although private companies cannot be licensed by Texas to dispose of low-level radioactive waste, they can contract with DOE to provide disposal services at a federally-owned site, and arguably at a privately-owned site controlled by DOE, and not be subject to either NRC or state regulation. 10 C.F.R. § 30.12(a) (1998). It is the current policy of DOE to dispose of DOE waste only at facilities licensed under state or federal law. *See* U.S. DEP'T OF ENERGY, COMMERCIAL DISPOSAL POLICY ANALYSIS FOR LOW-LEVEL AND MIXED LOW-LEVEL WASTES ES-2 (Mar. 9, 1999). Accordingly, as law and policy now stand, DOE waste may only be disposed of at licensed facilities, which, in Texas, excludes privately-owned facilities.

In *Waste Control Specialists*, the Fifth Circuit Court of Appeals held that DOE may, but is not required to, exercise control over private disposal facilities in Texas and thereby exempt them from state licensing requirements:

> If DOE chooses to regulate, or "control," the private waste disposal sites, then the sites are exempt from NRC and state licensing requirements. Where, however, DOE does not exercise such control, the NRC and the agreement states retain their power to regulate commercial sites providing a service to DOE. Nothing in the statute indicates that DOE must exercise regulatory authority over such sites.

*Waste Control Specialists*, 141 F.3d at 568. Since Texas will not license private disposal facilities, as a practical matter, given the current federal policy, no private company in Texas is eligible to dispose of DOE waste.

You ask "whether Texas has the power to adopt a law for the purpose of precluding a private company from contracting for the disposal of DOE low-level radioactive waste at a private site within Texas," and you tell us that bills are under consideration in the legislature relating to this and to your first question. Letter from Honorable Gary L. Walker, Texas House of Representatives, to the Honorable John Cornyn, Attorney General (Mar. 3, 1999) (on file with Opinion Committee). You appear to ask about proposed legislation, which you describe only by its purpose: to preclude private companies from accepting DOE waste. Since current Texas law, coupled with current federal policy, has the *effect* of the proposed legislation, we also address the validity of the current law. We believe that a law enacted *specifically for the purpose of precluding DOE waste* disposal at private facilities would face a federal constitutional challenge on the grounds that it violates the Supremacy Clause and the Commerce Clause of the United States Constitution. But we conclude that the current law, which has the same effect by virtue of current DOE policy, is constitutional.

B.     The Supremacy Clause.

The Supremacy Clause of the United States Constitution declares that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. A state law is preempted and "without effect" if it conflicts with federal law. *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). The Texas Supreme Court wrote extensively about federal preemption of state laws in *Hyundai Motor Company v. Alvarado*, 974 S.W.2d 1 (Tex. 1998). The court explained that federal law may preempt state law expressly or impliedly:

> A federal law may expressly preempt state law. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). Additionally, preemption may be implied if the scope of the statute indicates that Congress intended federal law to occupy the field exclusively or when state law actually conflicts with federal law. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (citing *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990)); *see also Moore v. Brunswick Bowling & Billiards Corp.*, 889 S.W.2d 246, 247-48 (Tex.1994). A state law presents an actual conflict with federal law when "'it is impossible for a private party to comply with both state and federal requirements' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Myrick*, 514 U.S. at 287 (quoting, respectively, *English*, 496 U.S. at 78-79, and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

*Id.* at 4 (parallel citations omitted). In sum, a Texas law purposely precluding a private company from contracting with DOE for the disposal of DOE waste in Texas would be preempted by federal law if (1) federal law expressly preempts it; (2) Congress intended federal law to occupy the field exclusively; or (3) state law actually conflicts with federal law by making it impossible for a private

party to comply with both Texas and federal law or by standing as an obstacle to the accomplishment of Congressional objectives.

No federal law expressly bars states from precluding private companies from receiving DOE waste. But it is likely that a law adopted for that purpose would be impliedly preempted. The United States Supreme Court has said that Congress has the power to regulate the disposal of low-level radioactive waste to the exclusion of state regulation. *New York v. United States*, 505 U.S. at 159-60. The Court has held that under the Atomic Energy Act "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983). Even where, as in Texas, the federal government has allowed the state to regulate low-level radioactive waste disposal pursuant to the terms of the Atomic Energy Act (allowing Agreement States to regulate) and the Low-Level Radioactive Waste Policy Amendments Act of 1985 (requiring states to provide for disposal), there has been less than a grant of total authority to the states over the disposal of low-level wastes within their own borders. *See Washington State Bldg. Constr. Trades Council v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982), *cert. denied*, 461 U.S. 913 (1983).

We cannot, in the absence of a specific law, determine for certain whether a law purposely precluding private facilities from disposing of DOE waste would make it impossible for a party to comply with both state and federal law, or whether such a law would present an obstacle to the accomplishment of the federal policy that makes the federal government responsible for the disposal of low-level radioactive waste owned or generated by DOE. *See* 42 U.S.C. § 2021c(b) (1994). But we think that a law whose express purpose is to thwart federal activities in the state would, absent a federal law expressly allowing it, be found to violate the Supremacy Clause.

C.    The Commerce Clause.

The Commerce Clause of the United States Constitution also may limit Texas's ability to enact a law purposely precluding private disposal companies from taking DOE waste in the absence of a federal law allowing it. The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. CONST. art. I, § 8, cl. 3. While the Clause is phrased as an affirmative grant of power, it has a "negative" or "dormant" aspect that restricts the states' power to enact laws that interfere with interstate or foreign commerce. *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 98 (1994). The principle underlying the interstate aspect of the Commerce Clause is that "our economic unit is the Nation," and states therefore may not act in isolation as separate economic units. *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 537-38 (1949); *accord, Oregon Waste Sys.*, 511 U.S. at 98.

The Supreme Court has held that hazardous waste is an article of commerce legitimately subject to constitutional protection. *See New York v. United States*, 505 U.S. at 159-60; *City of Philadelphia v. New Jersey*, 437 U.S. 617, 622-23 (1978); *see also Chemical Waste Management, Inc. v. Templet*, 770 F. Supp. 1142, 1149 (M.D. La. 1991) (finding that foreign generated hazardous

waste is object of commerce subject to Commerce Clause protection), *aff'd*, 967 F.2d 1058 (5th Cir. 1992). "Space in radioactive waste disposal sites is frequently sold by residents of one State to residents of another. Regulation of the resulting interstate market in waste disposal is therefore well within Congress' authority under the Commerce Clause." *New York v. United States*, 505 U.S. at 159-60.

When invoking the interstate portion of the Commerce Clause, courts have sought to avoid the evils of state economic isolationism and protectionism "while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *City of Philadelphia*, 437 U.S. at 623-24. Thus, when considering whether a state's regulation of interstate commerce is permissible, courts apply one of two tests. Where a state law effects simple economic protectionism, the statute is virtually invalid per se. *See id.* at 624. "The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." *Id.* A law that unambiguously discriminates against out-of-state goods is characterized as a protectionist measure that cannot withstand Commerce Clause scrutiny unless the state can demonstrate that the law furthers a legitimate local purpose that cannot be adequately served by nondiscriminatory alternatives. *See Oregon Waste Sys.*, 511 U.S. at 100-01. For example, this office has concluded that a Texas law expressly banning the importation into the state of waste generated in a foreign country violates the Commerce Clause. *See* Tex. Att'y Gen. Op. No. JC-0017 (1999).

But "'[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *City of Philadelphia*, 437 U.S. at 624 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). In other words, where a statute is facially neutral with regard to the treatment of out-of-state goods, it is subject to Commerce Clause scrutiny only if it affects interstate commerce. Courts will apply a balancing test to determine whether the statute's effects on interstate commerce outweigh the intended benefits of the statute.

Thus, to determine whether a statute violates the Commerce Clause, a court must examine the express terms of the statute, the purpose of the provision, the reason for its enactment, and its effect on interstate commerce. We do not have specific legislation to consider. However, a court would examine the express terms of the law to determine whether it is discriminatory on its face. A court would also weigh the purpose of the legislation against the statute's effect on the free movement of DOE waste in interstate commerce, and consider whether there is a less burdensome way to achieve the state's goal. Federal courts have found unconstitutional state laws restricting the flow of hazardous waste in the states where the laws were designed to protect state disposal capacity and the state's environment. *See, e.g., City of Philadelphia*, 437 U.S. at 622-23; *Chemical Waste Management*, 770 F. Supp. at 1152; *Diamond Waste, Inc. v. Monroe County, Georgia*, 939 F.2d 941 (11th Cir. 1991).

The proposal sounds, from your description of its purpose, like the type of overt protectionism designed to stop goods at the state's border that the Commerce Clause abhors absent a state interest that outweighs the statute's burden on interstate commerce. In our opinion, a statute which has as its express purpose the exclusion of DOE waste from the state would violate the Commerce Clause.

D.    Current Section 401.203 of the Texas Health and Safety Code.

Our discussion of the constitutional limitations on the proposed legislation should not be construed to include current section 401.203 of the Health and Safety Code. Under section 401.203, "[a] radioactive waste disposal license may be issued only to a public entity specifically authorized by law for radioactive waste disposal." TEX. HEALTH & SAFETY CODE ANN. § 401.203 (Vernon Supp. 1999). Because of current DOE policy, the combined federal and state laws have the effect of precluding private companies from accepting DOE waste. We think that section 401.203 does not suffer from the same constitutional infirmities as would mark the proposed legislation purposely excluding DOE waste.

Section 401.203 falls within the state's authority under its agreement with the Nuclear Regulatory Commission, as authorized by the Atomic Energy Act, to regulate radioactive waste disposal under state law. *See* 42 U.S.C. § 2021(b) (1994); Notice of Discontinuance of Certain Regulatory Authority and Responsibility within the State of Texas, 47 Fed. Reg. 15,186 (Apr. 8, 1982). As noted above, section 401.203 provides that a low-level radioactive waste disposal facility license may be issued only to a public entity. Because the DOE's current policy limits disposal of DOE waste to state-licensed facilities, the result is that private companies in Texas may not dispose of DOE waste. Federal preemption under the Supremacy Clause is not an issue in these circumstances because the federal government has deferred to the states.

Similarly, the Commerce Clause does not impose the same limitations on section 401.203 as it would on a statute purposely excluding DOE waste. Under the Commerce Clause, "[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Section 401.203 speaks neither expressly nor impliedly as to DOE waste. Rather, section 401.203 limits who may hold a license in Texas for disposing of low-level radioactive waste. It is facially neutral with respect to interstate commerce and its effect on the movement of DOE waste in interstate commerce is non-existent but for DOE's policy.

The statute's purpose is also nondiscriminatory and outweighs any effect it might have on interstate commerce. *See USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1288 (2nd Cir. 1995) (finding that city has compelling interest in preventing private companies from collecting commercial garbage in city), *cert. denied*, 517 U.S. 1135 (1996). The statutory predecessor to section 401.203 was adopted in 1981 as part of a larger bill reforming the regulation of low-level radioactive waste disposal. *See* Act of March 18, 1981, 67th Leg., R.S., ch. 21, § 1, 1981 TEX. GEN.

LAWS 31, 31. At the time, Texas was facing what some called a crisis with respect to radioactive waste disposal. The available disposal capacity in the state was seen as insufficient to handle the growing amount of waste, and a number of health and safety concerns existed with respect to the storage and disposal of waste. Out-of-state commercial disposal facilities were perceived as having poor track records of environmental compliance. There is some indication that the ban on the licensing of private disposal facilities was motivated by the legislature's desire to restore public confidence in the safety of radioactive waste disposal by restricting licensing to legislatively authorized public entities, which were perceived as likely to remain in existence and financially solvent longer than any individual and most corporations. Also, the legislature may have been aiming to achieve compatibility with a proposed or anticipated federal requirement that a site be governmentally owned. *See* HOUSE COMM. ON ENVIRONMENTAL AFFAIRS, BILL ANALYSIS, Tex. S.B. 480, 67th Leg., R.S. (1981).

Given the legislature's justifications for section 401.203, and the fact that the effect on DOE waste in interstate commerce exists only by virtue of a DOE policy, we conclude that section 401.203 does not violate the Commerce Clause of the United States Constitution.

E.    Conclusion.

It is our opinion that a Texas law enacted for the purpose of precluding private waste disposal companies in Texas from contracting with the United States Department of Energy to dispose of low-level radioactive waste in the state would face significant constitutional challenges under the Supremacy Clause and the Commerce Clause of the United States Constitution. However, section 401.203 of the Health and Safety Code, which allows only state entities to be licensed to dispose of low-level radioactive waste in the state, is not unconstitutional simply because, in combination with a DOE policy, it has the effect of precluding private companies from contracting with DOE for the disposal of waste in Texas.

## SUMMARY

The development of an assured-isolation facility complies with the state's current obligations under Texas Low-Level Radioactive Waste Disposal Compact to manage and to provide for the disposal of low-level radioactive waste. Assured isolation does not effect the permanent isolation or disposal of low-level radioactive waste, and therefore it does not currently satisfy the state's obligation under the Compact to dispose of the waste. Whether an assured isolation facility will ultimately become a legally viable option for the disposal of low-level radioactive waste, and thereby satisfy the Compact, simply cannot be predicted.

An attempt by Texas purposely to preclude private low-level radioactive waste disposal companies in Texas from contracting with the United States Department of Energy to dispose of DOE low-level radioactive waste is limited by the Supremacy and Commerce Clauses of the United States Constitution. However, section 401.203 of the Health and Safety Code, which allows only state entities to be licensed to dispose of low-level radioactive waste, is constitutional.

Yours very truly,

JOHN CORNYN
Attorney General of Texas


ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Prepared by Barbara Griffin
Assistant Attorney General