**Paul E. CRANE, Plaintiff,**

v.

**SECRETARY OF THE ARMY, Defendant.**

**No. 96–CV–418C(H).**

United States District Court, W.D. New York.

March 15, 2000.

156

Block & Colucci, P.C. (D. Patrick Gallaher, of counsel), Buffalo, NY, for Plaintiff.

Denise E. O'Donnell, United States Attorney (Mary K. Roach, Assistant United States Attorney, of counsel), Buffalo, NY, for Defendant.

## DECISION AND ORDER

CURTIN, District Judge.

### *INTRODUCTION*

Plaintiff Paul E. Crane alleges that defendant, the Secretary of the Army, violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, and his constitutional right to due process by involuntarily dismissing him from the United States Army. Defendant moves to dismiss plaintiff's complaint. Plaintiff opposes and cross-moves for summary judgment. For the reasons set forth below, defendant's motion to dismiss is denied and plaintiff's motion is granted.

## FACTS

### I. Background Facts

In May of 1980, Crane was commissioned as a Second Lieutenant in the United States Army. In the years that followed, he received numerous awards for his outstanding service and exemplary performance. He was promoted to Captain in 1984, and promoted to the rank of Major in 1992. Record ("R.") at 164.

At every station where Major Crane served, he received commendation for excellent service. In 1983, he received the Army Commendation Medal for outstanding performance. R. 170. In 1984, he received the Army Achievement Medal for exceptional meritorious duty. R. 171. In 1987, he received the Meritorious Service Medal for his service in Korea. R.166. And in 1989, he again received the Army Commendation Medal while serving at Fort Dix. R. 168.

Throughout his tenure in the Army, Crane's overall military performance was periodically rated by his immediate commanders in an Officer Evaluation Report ("OER"). The OER is a form that is divided into several parts, with each part addressing a different aspect of military service. Part IV of the OER is entitled "Professionalism" and consists of fourteen categories, including a category on whether the officer being evaluated has the proper military bearing and appearance. For each category, the officer is rated on a scale of "1" to "5," with "1" being the highest rating attainable.

### II. Plantiff's Weight Problems

Until 1990, Crane received only superior marks on his OERs. In fact, on each occasion he was rated equal to or better than his peers.[1] In August of 1990, however, Crane began having problems controlling his weight. His OER for the period of August 31, 1990 to February 19, 1991 noted that Crane exceeded the Army's weight limits; however, the rater, a senior colonel, included a notation that Crane was enrolled and making satisfactory progress in the battalion's Weight Control Program and proceeded to award plaintiff a "1" for physical fitness. Ultimately, the colonel who rated Crane recommended him for promotion. R. at 5.

Crane's next OER was issued in February of 1992. The rater noted that Crane had lost weight and was presently within his prescribed weight limits. The rater also awarded plaintiff a "1" for military bearing and appearance and praised Crane's overall military performance. R. at 154–55.

In December of 1992, Crane was treated by Colonel Charles F. Miller, M.D., of the Medical Corps. Shortly thereafter, Dr. Miller issued a memorandum to Crane's commanding officer, informing the officer that Crane was being treated for *familial hypercholestrolemia*,[2] and should "not be placed on the Army Weight Program" or suffer "any unfavorable action ... for a period of 90 days ...." R. at 20. The Army abided by Dr. Miller's recommendation, and Crane was removed from the Weight Control Program until April of 1993. R. at 184.

On January 8, 1993, while Crane was exempt from the Weight Control Program, he received another OER that noted that he had again exceeded his prescribed weight. R. at 10. As with the first adverse OER, the rater noted in Part IV and Block 12 of the January 1993 OER that Crane had exceeded his Army weight limit, and awarded him a "2" for military bearing or appearance. R. at 10. However, the

---

1. Some typical comments of OER raters were "most technically proficient of the six company commanders" and "CPT Crane's company is the best in the battalion ... He is involved in every aspect of his mission and leads from the front in a positive, can-do manner." R. at 28–29.

2. Familial hypercholesterolemia is a condition where there is an abnormally large amount of cholesterol in the cells and plasma of the circulatory blood in more members of a family than can be accounted for by chance. *Stedman's Medical Dictionary*, pp. 627, 823 (1995).

rater noted that "Crane is not in compliance with the standards of AR 600–9.[3] He is being treated for familial hypercholesterolemia which may be a contributing factor to his difficulty in maintaining proper weight." [4] *Id.* The OER contained no other derogatory comments regarding Crane's military performance. *Id.* On the contrary, the rater awarded Crane a "1" for his knowledge, expertise, appearance, and physical fitness. *Id.*

On April 5, 1993, Crane reenrolled in the Weight Control Program, and weighed in at 212 pounds.[5] R. at 184. Crane next weighed in on July 27, 1993 at 203 pounds. As the record indicates, Crane was in compliance with the Weight Control Program and was noted for making satisfactory progress toward his required weight. R. at 184.

On August 23, 1993, Crane underwent surgery for a previous injury to his left knee. R. at 24. After the surgery, Crane was placed on crutches until October of 1993. As a result, Crane's doctor ordered that he be classified as a "P2 Profile." A P2 serviceman is not required to run or follow the standard Army fitness tests; instead, the serviceman participates in non-impact exercise. Based on his P2 status, the physician recommended that no adverse action be taken against Crane until January 15, 1994, or at such time when his recovery from knee surgery was complete. R. at 23–24, 118–119, 186.

Despite the physician's recommendation, plaintiff was required to weigh in for the Weight Control Program from October 1993 through January 1994. R. at 184. After each weigh-in, it was noted in Crane's record that he continued to exceed

the Army's weight limit, but nothing was mentioned about his P2 status.

Complications with the plaintiff's recovery caused his P2 status to be extended until April of 1994. R. at 202. In February of 1994, while Crane continued to exercise under P2 status, he was notified that the Army had commenced separation proceedings against him for his "[f]ailure to conform to prescribed standards of dress, personal appearance, and military deportment." R. at 12. The Army based the involuntary discharge on Part IV of the OERs dated August 1990 and January 1993, and ordered Crane to show cause as to why he should be retained on active duty. *Id.*

A short time later, Crane submitted a rebuttal statement. R. at pp. 17–19. The Army considered the statement and decided that a Board of Inquiry ("BOI") Hearing was needed to determine whether Crane should be separated for substandard performance. R. at 45.

In the meantime, Crane's P2 Profile was lifted, and he re-enrolled in the Weight Control Program. Without the limitations of P2 status, Crane immediately began to lose weight. By the time the BOI Hearing took place in September of 1994, Crane had lost between 21 and 27 pounds. R. at pp. 56, 62, and 64.

### III. The Board of Inquiry Hearing

The first three witnesses to testify at the BOI Hearing were: 1) Staff Sergeant Ronald Smith, the noncommissioned officer in charge of the Weight Control Program; 2) Captain Carol DeBarto, the offi-

---

**3.** AR 600–9 establishes policies and procedures for the implementation of the Army Weight Control Program. AR 600–9, paragraph 21(j), provides that officers who do not meet the Army weight standards will be considered for separation pursuant to AR 635–100, paragraph 5, which lists the reasons for eliminating officers.

**4.** It was later discovered that this condition in no way affected plaintiff's ability to lose weight.

**5.** The Army's weight chart requires that a person of plaintiff's height and age should weigh no more than 179 pounds. AR 600–9 provides that an overweight officer is in compliance with the weight problem so long as he is enlisted in the weight-loss program and loses 3–8 pounds per month.

cer responsible for monitoring the Weight Control Program; and 3) Dr. Charles Eggbert, M.D.

Both Smith and Eggbert's testimony supported the retention of Crane. Smith testified that Crane had made acceptable progress, losing the required amount of weight each month and decreasing his body fat percentage. R. at 56–57. Eggbert testified that "[l]oss of weight should be gradual to be the most effective.... [Crane] lost 27 pounds. That is good progress.... [H]e should not be losing weight at a greater rate." R. at 62.

Captain DeBarto was the only witness to testify against Crane. She testified that plaintiff "did not possess military appearance and demeanor." R. at 57–58. DeBarto further alleged that while she was in charge of the Weight Control Program, Crane failed to appear at scheduled weigh-ins, and that on one occasion she witnessed enlisted men mocking Crane for being overweight. *Id.* On cross-examination, DeBarto admitted that she and Major Crane had a disagreement about a summary court martial, in which he had acquitted a soldier in her command, a decision with which she strongly disagreed. R. at 57–60.

Several witnesses testified on Crane's behalf. Lieutenant Colonel Bruce Zophy, who served as Crane's rater for several OERs, including the OER issued in January of 1993, testified that he had frequent contact with Crane and found his "appearance, uniform, and deportment ... well within Army Regulation standards." R. at 63. In fact, he noted that he had promoted Crane to his current position and would not have done so if Crane "lacked military bearing and deportment." *Id.* Zophy also downplayed DeBarto's testimony that she overheard other soldiers mocking Crane at a basketball game by explaining that "[t]here isn't a leader [in the Army] who doesn't get laughed at," but further noted that he had never heard of enlisted men or officers mocking or laughing at Crane. R. at 63–64.

Frederick Harris testified about the tense relationship he witnessed between Captain DeBarto and Crane. R. at 66. Harris, who at the time of the BOI Hearing was no longer enlisted in the Army, testified that on at least two occasions, DeBarto "shrugged ... off" Crane's requests to speak with her. *Id.*

Captain Maria E. Bovill, a dietitian, testified that Crane was making satisfactory progress in the Weight Control Program. R. at 64–66. She verified that Crane lost 27 pounds and 4 percent of his body fat since April of 1994, and that prior to that it was difficult for him to lose weight given his limited ability to exercise under P2 status. R. at 64.

Master Sergeant Michael Miles, a non-commissioned officer in Crane's work section, testified that in the 18 months that he had worked with Crane, he found him to have excellent leadership skills. Miles recalled several occasions in which Crane and he had participated in physical training activities together, and noted that when Crane was not under P2 status he made a consistent effort to lose weight. R. at 66–67. Miles further testified that Crane "cares for the soldiers" and "knows how to utilize proper problem solving techniques ...." *Id.*

Crane also testified on his own behalf. R. at 68–71. He clarified that he had health problems which had interfered with his participation in the Weight Control Program and prevented him from staying within the weight limits. Crane further clarified that although his health problems caused him to exceed the weight limits, he otherwise demonstrated the appropriate standards of dress, personal appearance, and military deportment. *Id.*

Crane also offered medical documents supporting his claims as to his ailments and injuries, as well as 20 documents verifying his exemplary record of military service. R. at 150–172. Two letters were also submitted to the BOI by Crane's fellow officers, both urging the BOI to retain Crane. R. at 127–28. The only documen-

tary evidence relevant to Crane's dress, personal appearance, or military deportment submitted to the BOI were copies of the August 1990 and January 1993 OER.

## IV. Recommendation and Decision for Discharge

The evidence at the hearing concluded at 1826 hours on September 26, 1994. Fourteen minutes later at 1840 hours, the Board reconvened and orally announced its verdict. In spite of the favorable testimony of Lieutenant Colonel Zophy, who had frequent contact with Crane, and the testimony of the other witnesses who also supported his retention, the BOI recommended that Crane be separated from the Army in accordance with AR 635–100 for failing to meet the standards of dress, personal appearance, and military deportment. More specifically, the Board found that "Major Paul E. Crane ... has not complied with the prescribed standards of dress, personal appearance, and military deportment, in that he did not possess and maintain military bearing and appearance as evidenced by testimonial and documentary [sic], to include the Officer Evaluation Reports for the period 900831–930108." R. at 71–72.

The BOI's recommendation was forwarded through the chain of command to the United States Total Army Personnel Command, often referred to as PERSCOM. Major Crane was given the opportunity to comment to PERSCOM, but the group of officers approved the Board's recommendation even though certain errors were detected. R. at 248. PERSCOM recommended that Crane be separated for "substandard performance," specifically, for his failure to conform to prescribed standards of dress, personal appearance, and military deportment. R. at 71–72 and 250.

Finally, the Secretary approved the involuntary discharge, but not on the ground that the BOI and PERSCOM had recom-

mended. Rather than granting the separation on the ground that Crane failed to comply with AR 635–100, pertaining to military dress and deportment, the Secretary approved separation on the ground that Crane failed to comply with Army weight standards under 600–9. R. at 254.

## V. Procedural History

Crane was notified of the Secretary's decision on October 27, 1995. On June 25, 1996, Crane filed the present action under the APA, alleging that the Secretary of the Army's decision to discharge him from the Army was arbitrary, capricious, and not based upon substantial evidence. Crane also claims that the Army violated his Fifth Amendment right to due process by failing to notify him of the true basis for his discharge. Plaintiff seeks to be reinstated to the Army and restored to the status he would occupy had he not been discharged in 1996.

On September 6, 1996, the government filed a motion to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). Item 6. On April 28, 1997, this court transferred the case to the Court of Federal Claims.[6] In July of 1998, however, Judge Moody Tidwell, III, held that the Court of Federal Claims was not the proper venue for resolution of Crane's action, and transferred the case back to this court. Shortly thereafter, defendant renewed his earlier motion to dismiss on additional grounds, and plaintiff renewed his cross-motion for summary judgment. Supplemental briefs were filed a short time later, and oral argument on the motions was held on February 25, 1999. Items 24–26.

### DISCUSSION

Defendant moves to dismiss Crane's complaint on four grounds: (1) Crane failed to exhaust his administrative remedies; (2) the case involves non-reviewa-

6. The Court of Federal Claims is the proper venue to entertain money claims brought against the government based on the Consti-

tution, federal statutes, executive regulations, or contracts.

ble/non-justiciable issues; (3) the decision to discharge Crane was not arbitrary, capricious, contrary to law or regulation, or unsupported by substantial evidence; and (4) the complaint fails to state a cause of action for violation of Crane's constitutional due process rights. *See* Item 25. Plaintiff opposes defendant's motion and cross-moves for summary judgment, arguing that based on the record there are no triable issues of fact as to his claims; and as such he is entitled to judgment in his favor as a matter of law.

## I. Exhaustion of Administrative Remedies Under the APA

Defendant argues that this action should be dismissed because plaintiff failed to exhaust his administrative remedies. Specifically, the Secretary asserts that Crane failed to appeal his discharge to the Army Board for the Correction of Military Record ("ABCMR").[7]

In *Guitard v. Secretary of the Navy,* 967 F.2d 737 (2d Cir.1992), the Second Circuit addressed the exhaustion requirement as it applied to disciplinary decisions rendered by the Armed Forces. *Guitard* involved a lieutenant in the Navy Nurse Corps who was discharged from the Navy after a Board of Inquiry had determined that the lieutenant refused to submit to a drug test and had engaged in marijuana use. Before appealing to either the Board for the Correction of Naval Records or to the Naval Discharge Review Board, plaintiff sought a preliminary injunction in federal court barring his discharge. The district court granted the injunction and ordered the Navy to conduct further hearings that culminated in a report which again recommended Guitard's discharge. *Id.* Dissatisfied with the Navy's response, the district court issued a second temporary restraining order, from which the Navy appealed.

The Court of Appeals reversed the district court, holding that under the doctrine of exhaustion of administrative remedies, "a party may not seek federal judicial review of an adverse administrative determination," including military discharge determinations, "until the party has first sought all possible relief within the agency itself." *Guitard v. United States Secretary of the Navy,* 967 F.2d at 740 (citations omitted).

Approximately one year later, the Supreme Court decided *Darby v. Cisneros,* 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). In *Darby,* the Court explicitly held that federal courts have no authority to require plaintiffs to exhaust administrative remedies prior to seeking judicial review under the APA unless a statute or agency regulation specifically mandates exhaustion as a prerequisite to judicial review. *Darby,* 509 U.S. at 144–146, 113 S.Ct. 2539. Unlike other past decisions, the Court in *Darby* did not distinguish nor exempt the military, or its separate justice system, from its holding.

Almost without exception, federal courts throughout this country have also declined to create a military exception to the Court's decision in *Darby.* In *St.Clair v. Secretary of the Navy,* 970 F.Supp. 645 (C.D.Ill.1997), a naval enlistee challenged the characterization of his dishonorable discharge under the APA. The Secretary of the Navy moved to dismiss, arguing that the plaintiff had failed to appeal the discharge decision to the Naval Discharge Review Board. The district court in Illinois denied the motion and held that under *Darby,* plaintiff was not required to exhaust his administrative remedies prior to challenging the characterization of his discharge under the APA. *St. Clair,* 970 F.Supp. at 647.

---

7. The ABCMR handles all administrative appeals resulting from military discharges, and has the authority to correct an error or remove an injustice from military personnel records. 10 U.S.C. § 1552(a). This includes the authority to consider claims based on "constitutional, statutory and/or regulatory violations," 32 C.F.R. § 581.3(c)(5)(v), as well as the broad equitable power to order back pay and reinstatement. 10 U.S.C. § 1552(a) and (c). Until it is reviewed by the ABCMR, the Army does not consider a decision final.

District courts have made similar decisions where military personnel have challenged their discharges from the Armed Forces. In *Perez v. United States,* 850 F.Supp. 1354 (N.D.Ill.1994), plaintiff sought relief under the APA after he was dishonorably discharged from the Navy. Defendant moved to dismiss plaintiff's complaint because he had failed to exhaust his administrative remedies. The district court denied the motion, ruling that *Darby* applied to the military judicial system because "nothing in the applicable statute, 10 U.S.C. § 1552 or regulations, 32 C.F.R. Part 372, *require[d]* Perez to avail himself" to the Navy's broad remedial powers. *Perez,* 850 F.Supp. at 1360; *see also Merritt v. Dalton,* No. 97–513, 1998 WL 53943, at *3 n. 2 (N.D.Fla. Jan. 12, 1998) (dismissing defendant's argument that plaintiff's claim was barred because he failed to exhaust his administrative remedies within the Navy before filing a federal action under the APA); and *Watson v. Perry,* 918 F.Supp. 1403, 1411 (W.D.Wash.1996), *aff'd,* 124 F.3d 1126 (9th Cir.1997) (holding that actions brought against the military under the APA do not require administrative exhaustion before judicial review); *but see Saad v. Dalton,* 846 F.Supp. 889 (S.D.Cal. 1994) (ruling that the *Darby* decision was limited to actions brought under the APA against the Department of Housing and Urban Development).[8]

Federal Courts of Appeals have also declined to read a military exception into the Supreme Court's ruling in *Darby.* In *Dowds v. Clinton,* 18 F.3d 953 (Table), 1994 WL 85040, 305 U.S.App. D.C. 193 (D.C.Cir.1994), the Circuit Court of Appeals for the District of Columbia held that pursuant to the Court's decision in *Darby,* the plaintiff was not required to resort to the Military Board of Correction prior to

filing suit in federal court. Approximately one year later, in *Ostrow v. Secretary of Air Force,* 48 F.3d 562 (Table), 1995 WL 66752 (D.C.Cir.1995), the court reaffirmed its decision in *Dowds,* declining the Secretary's invitation to construe a military exception to the rule on exhaustion set forth in *Darby.* *See also Robertson v. United States,* 145 F.3d 1346 (Table), 1998 WL 223159 *4 n. 2 (10th Cir.1998) (noting that "other courts no longer require exhaustion in military cases due to the holding in *Darby* ").[9]

While the Second Circuit has not expressly addressed *Darby's* effect on the military justice system, it indicated in *Able v. U.S.,* 88 F.3d 1280, 1288 n. 7 (2d Cir. 1996), that the *Darby* decision placed additional restrictions on the applicability of the exhaustion doctrine in a military setting. *Able* involved a challenge by homosexual members of the Armed Forces to the government's "Don't Ask, Don't Tell Policy." Because plaintiffs, who were known homosexuals, had yet to be separated from the military, the court found that the plaintiffs had yet to suffer "adverse administrative action;" and as such, the restrictions of *Darby* did not apply. *Able,* 88 F.3d at 1288 n. 7. The court did, however, cite its decision in *Howell v. I.N.S.,* 72 F.3d 288 (2d Cir.1995). *Howell* involved a challenge to a deportation order issued by the Immigration and Naturalization Service. In ruling on whether the plaintiff was obligated to exhaust his administrative remedies, the court reasoned that the *Darby* restrictions did not apply because "agency regulations specifically identify the administrative remedies for [plaintiff] to pursue." *Howell,* 72 F.3d at 293 (citing *Ciba–Geigy Corp. v. Sidamon–Eristoff,* 3 F.3d 40, 45 n. 4 (2d Cir.1993) (holding that

---

**8.** It is well established within the Second Circuit that the Court's decision in *Darby* applies to all actions brought under the APA regardless of the agency (or agencies) named as a defendant. *See Top Choice Distributors, Inc. v. U.S. Postal Service,* 138 F.3d 463 (2d Cir. 1998); *Ciba–Geigy Corp. v. Sidamon–Eristoff,* 3 F.3d 40, 45 n. 4 (2d Cir.1993) (involving the Environmental Protection Agency); *Howell v.*

*I.N.S.,* 72 F.3d 288, 291 (2d Cir.1995) (involving the Immigration and Naturalization Service); *Bastek v. Federal Crop. Ins. Corp.,* 145 F.3d 90 (2d Cir.1998)

**9.** Under the 10th Cir. R. 36.3, 2d Cir. R. 23 and CTADC R. 28, the holdings in *Dowds* and *Robertson* are not binding precedent, but the cases are cited for their persuasive value.

the *Darby* restriction does not apply because the agency regulations required exhaustion)).

The Secretary of the Army argues that although the Second Circuit has not created an explicit military exception to *Darby*, this court could find that such an exception exists based on the decisions of the Eastern District of New York in *Phillips v. United States*, 910 F.Supp. 101 (E.D.N.Y. 1996); and *Janniere v. United States*, 34 F.Supp.2d 850 (E.D.N.Y.1999). However, I am unpersuaded by the reasoning in *Phillips* and *Janniere*, which involved not military officers but rather cadets expelled from military academies. But what concerns me more than the factual distinctions is that neither the *Phillips* nor *Janniere* decisions discuss, distinguish, provide a military exception to, or even cite *Darby*. Instead, the courts relied completely on the Second Circuit's decision in *Guitard* which, based on the *Able* decision, was at least altered by the Supreme Court's decision in *Darby*. In fact, since *Phillips* and *Janniere*, other courts within the Second Circuit have recognized the impact that *Darby* had on the Second Circuit's decision in *Guitard*. *See Cunningham v. Loy*, 76 F.Supp.2d 218, 221 (D.Conn.) (noting that *Darby* altered the *Guitard* analysis as it applied to cases brought against the military under the APA.)[10]

■ Based on the above, I find that plaintiff was not required to exhaust his administrative remedies prior to filing the present action. To date, neither the statute which governs the Army's administrative procedures, 10 U.S.C. § 1552(a), nor the Army's own internal regulations require exhaustion. Further, more than six years have passed since the Court's decision in *Darby*, and Congress has yet to enact legislation for the Armed Forces which include an exhaustion requirement; nor has the Secretary of the Army acted to impose such a requirement by regulation.

Until such action is taken, military personnel like Crane will not be required to exhaust all available remedies before seeking judicial review of military decisions under the APA.

## II. Deference Afforded to the Military

Defendant argues that even if *Darby* permits plaintiff to bring the present action, the action must be dismissed because plaintiff's claims require the court to intrude into an area committed to military discretion. I disagree.

■ There is no question that due deference to military decision-making is a part of American Jurisprudence. *See Goldman v. Weinberger*, 475 U.S. 503, 508, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). Indeed, that deference was eloquently expressed by the Court in *Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953):

> Judges are not given the task of running the Army .... The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Id.* at 93–94, 73 S.Ct. 534. Deference to military decision-making, however "is not synonymous with abdication, especially where issues of a constitutional dimension are raised." *Gunning v. Walker*, 663 F.Supp. 941, 943 (D.Conn.1987) *aff'd*, 847 F.2d 834 (2d Cir.1988) (citing *Rostker v. Goldberg*, 453 U.S. 57, 67, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981)). Indeed, the Second Circuit Court of Appeals has determined that judicial review of military decisions is permissible when the actions of the armed services are in violation of the military's own regulations or beyond their powers, and do not involve matters " 'rea-

---

**10.** The plaintiff in *Cunningham* was a Coast Guard Officer who sought a writ of mandamus compelling the Coast Guard to promote him. In its opinion dismissing the case for lack of jurisdiction, the district court noted that because plaintiff did not seek review under the APA, the exhaustion requirement applied.

sonably relevant and necessary to further-ance of our national defense.'" *Mack v. Rumsfeld,* 784 F.2d 438, 439 (2d Cir.1986) (quoting *Katcoff v. Marsh,* 755 F.2d 223, 234 (2d Cir.1985)); *see also Crawford v. Cushman,* 531 F.2d 1114, 1120 (2d Cir. 1976).

■ Defendant argues that the Army's regulations as to the physical fitness and appearance of military personnel are "reasonably relevant and necessary to further-ance of our national defense." That may be true; but unlike the plaintiffs in *Mack* and the other cases cited by defendant, the plaintiff here is not asking this court to alter or interfere with the regulations as they are written.[11] More specifically, Crane is not seeking to change the Army's weight limits or its regulations, nor does he question the validity of those regulations on which his discharge was based. Rather, Crane seeks to have this court review the process in which those regulations were imposed.

Accordingly, because Crane challenges the procedure and not the substance of the regulations, I find his claims justiciable. *See Crawford,* 531 F.2d at 1120 (2d Cir. 1976); *see also St. Clair v. Secretary of the Navy,* 970 F.Supp. 645, 648 (C.D.Ill.1997) (citations omitted).[12]

### III. APA Claim

■■ Plaintiff claims that the Secretary of the Army's decision to discharge him violated the APA. Under the APA, a court may review a military discharge decision to determine if the decision was arbitrary, capricious, in bad faith, unsupported by substantial evidence, or contrary to law, regulation, or published procedure. 5 U.S.C. § 706(2)(A); *see also Perez v. United States,* 850 F.Supp. 1354, 1365 (N.D.Ill.1994). A decision is arbitrary and capricious if it is not based upon relevant factors, lacks a rational basis, or represents a clear error in judgment. *McIntyre v. United States,* 30 Fed. Cl. 207, 213 (1993).

### A. Defendant Failed to Follow Published Army Regulations

■ Plaintiff submits clear evidence that the Army failed to comply with its own administrative procedures. The APA requires the Army, like any other agency, to follow its own administrative procedures. *Smith v. Resor,* 406 F.2d 141, 145 (2d Cir.1969). An agency's failure to follow its own established procedures or regulations constitutes a violation of the APA. *Miller v. Henman,* 804 F.2d 421, 424 (7th Cir.1986); *Montilla v. I.N.S.,* 926 F.3d 162, 167 (2d Cir.1991) (holding that "'where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures'" (quoting *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)).

Although great deference is given to military decision making in general, courts do not abdicate their duty to review military actions which violate the military's own regulations. *Gunning v. Walker,* 663 F.Supp. 941, 943 (D.Conn.1987); *see also Phillips v. United States,* 910 F.Supp. 101,

11. In addition to citing the Second Circuit's decision in *Mack,* defendant also argues that the District Court of Connecticut's decision in *Gunning v. Walker,* 663 F.Supp. 941 (1987) is also applicable to the present case. I disagree. Similar to the plaintiffs in *Mack,* the plaintiff in *Gunning* was challenging the legality of the regulation on which his discharge was based. Moreover, Gunning's due process claims were based on the theory of double jeopardy. He did not challenge the manner in which his discharge proceedings were administered. As indicated above, the plaintiff here is not challenging the legality or the necessity of the Army's regulations as to weight and military appearance of its servicemen. Crane's claim challenges the manner in which the regulations were applied. This distinction renders the decisions in *Gunning* and *Mack* inapplicable to the case at bar.

12. The focal point of plaintiff's complaint is that the Secretary's decision to discharge him: (1) deprived him of due process, (2) was arbitrary and capricious, and (3) was an abuse of the Secretary's discretion. These claims are distinct from the issues in afforded deference in *Gunning* and *Mack,* and as such are subject to the review of this court.

108 (holding that the APA requires United States Military Academy to act in accordance with the procedures it has imposed upon itself to insure that due process requirements are met).

### 1. Army Regulation 635–100

 AR 635–100 is the Army regulation which governs the procedures for discharging an officer. Pursuant to Section 5–14(a) and (b) of AR 635–100, Army officers subjected to elimination proceedings must be provided with written notice that elimination proceedings have been initiated and advised of the reasons. *See* Item 7, Exh. A at p. 35. AR 635–100 does not give the Secretary of the Army the discretion to discharge an officer absent this specific notification, nor does the regulation provide the Secretary with the authority to discharge an officer for reasons other than those specified in the written notification. *See id.*

Here, it is uncontested that on February 8, 1994, Crane was notified that he was being processed for involuntary discharge for "[f]ailure to conform to prescribed standards of dress, personal appearance, and military deportment," as substantiated by his OERs dated August 31, 1990 to February 19, 1991 and February 20, 1992 to January 8, 1993. R. at 12. Nor is it contested that the notification letter directed Crane "to show cause for retention on active duty under the provisions of AR 635–100, paragraph 5–10h," and that a BOI Hearing was held on whether plaintiff was in compliance with 5–10h. *Id.* It is further agreed that both the BOI and PERSCOM determined that Crane should be discharged based on 5–10h; but in reviewing the groups' decision, the Secretary unilaterally changed the ground for discharge to 5–10i, failure to achieve satisfac-

tory progress in the Weight Control Program, and Crane was never notified of this change or granted a new hearing to determine whether he was in compliance with the Weight Control Program.

While defendant concedes that he failed to provide notice of discharge processing under 5–10i as required under 5–14(a) and (b), he contends that the evidence presented to the BOI and PERSCOM demonstrates that Crane had constructive notice of the discharge on 5–10i grounds. This argument fails for two reasons. First, AR 635–100 requires specific notice and does not make a reference, let alone a provision for constructive notice. Second, the notion of due process not only affects the type of evidence the accused will present in his defense, but also the type of evidence a prosecuting party must proffer to prove its case. Had plaintiff been processed for discharge based on 5–10i, the Army would have been required to meet a different set of standards than those established for separation under 5–10h. As such, the defendant's violation of his own administrative procedures was not cured by any type of constructive notice.[13]

### B. Lack of Evidence to Support Discharge Under 5–10h

 The BOI's decision to discharge Crane under AR 635–100 5–10h was based on only three pieces of evidence, each of which has been called into question by other evidence in the administrative record. The first piece of evidence is Crane's OER for the period August 1990 to February of 1991. R. at 5–6. This OER indicates that Crane was awarded a "2" for military bearing and appearance, and notes that he had exceeded the Army's weight limits. However, as indicated

---

**13.** Defendant attempts to evade the fact that he failed to follow the procedures in AR 635–100 5–14 by arguing that the basis on which plaintiff was discharged was changed so that plaintiff would be eligible for separation pay, and infers that the change was made at plaintiff's request. *See* Item 9, p. 10, n. 27. However, regardless of who requested the change, Army regulations require that written notification of the basis of discharge be provided to an officer prior to his separation; and if the separation is based on 635–100 10i, the procedures within AR 600–9 are followed. Here, it is clear that the Secretary failed to comply with both AR 600–9 and AR 635–100.

above, performance ratings on OERs range between "1" and "5," with "1" being the highest grade awarded. The fact that the rater awarded plaintiff a "2" is not persuasive evidence that Crane's military bearing and appearance were so lacking that his discharge was warranted. Moreover, a complete reading of the OER reveals that the rater commented that the "2" referred to plaintiff's weight control problem, but noted that plaintiff was enrolled and making satisfactory progress in the Weight Control Program. The same rater also awarded plaintiff a "1" for physical fitness, and further commented that Crane had an "[o]utstanding performance of duty," and "[g]iven continued satisfactory progress with his weight, he should definitely be promoted ...." R. at 6. Based on the rater's comments and recommendations, the "2" listed on the OER cannot be considered conclusive evidence that Crane lacked the proper military bearing or appearance.

The second OER submitted to the BOI addressed the time period from February of 1992 to January of 1993. Again, the only indication that plaintiff failed to meet the prescribed appearance requirement was that he exceeded his required weight and that he was awarded a "2" for military bearing and appearance. All other comments on the OER were favorable; and ultimately, Crane was recommended for promotion. Furthermore, Crane submitted an explanation as to why he was not able to maintain his required weight during the period of the January 1993 OER. *See* R. at 8. As Crane's letter explains and medical evidence verifies, Crane was under the care of Dr. Miller for *familial cholesterolemia*. Dr. Miller had ordered in writing that plaintiff not be placed in the Weight Control Program nor receive any other unfavorable treatment until his condition could be properly treated. Thus, according to Dr. Miller's order, plaintiff should not have even been evaluated as to his weight or appearance on this OER.

The only other proof offered as to Crane's lack of military bearing and appearance was the testimony of Carol De-Barto. As noted above, DeBarto served as the officer responsible for monitoring the Weight Control Program from 1992 to May of 1994. On direct examination, DeBarto testified that in her opinion, Crane did not exhibit the proper military bearing and appearance due to his weight. R. at 57–59. DeBarto further testified that she witnessed other servicemen mocking Crane about his weight during a basketball game held at the Army base. *Id.* She further alleged that Crane missed weigh-ins, had a negative demeanor toward the Weight Control Program; and that on one occasion, he told her that she could not make him lose weight and that he intended to avoid losing weight until his retirement. *Id.*

On cross-examination, however, the credibility of each of DeBarto's allegations was significantly impeached. For example, DeBarto admitted that Crane was excused for at least some of the weigh-ins that she alleged he skipped. *Id.* She further admitted that she was aware of the medical limitations which had been imposed on Crane and how these limitations had an adverse effect on his ability to participate in the Weight Control Program. DeBarto also admitted that based on Dr. Miller's letter, plaintiff should not have been reviewed as to military bearing and appearance on his January 1993 OER, that neither of the OERs admitted as evidence against Crane contained negative comments as to his military bearing and appearance, and that she and Crane had a substantial disagreement while serving as jurors on a court martial.

DeBarto's allegations against the plaintiff were even further weakened by the testimony of several other witnesses. Lieutenant Colonel Zophy, whom Crane worked under while in Germany, testified that Crane's "appearance, uniform, and deportment [were all] within Army Regulation standards." R. at 63. Zophy also commented that he would not have promoted Crane to a position of high visibility if he lacked military bearing and appear-

ance. *Id.* As to allegations that other serviceman mocked or publicly criticized Crane because of his weight, Zophy commented that he had never heard of Crane's being mocked for either his weight or appearance and dismissed DeBarto's allegations by explaining that at some point, all leaders in the military get laughed at by their subordinates. R. at 63. Frederick Harris also questioned DeBarto's credibility and motives when he testified to the strained relationship that existed between DeBarto and Crane, and how on two occasions DeBarto "shrugged ... off" Crane's requests to speak with her. R. at 66.

The documentary evidence submitted by Crane gives further reason to question whether the decision to discharge him under 5–10h was supported by substantial evidence. Most notable are the letters from Major Alexandro Wright and Operations Specialist Stephen Dykes. R. at 126–28. Dykes and Wright attest to Crane's professional appearance and military deportment. Dykes' statement also impeaches Captain DeBarto's credibility and the truthfulness of the allegations she made against Crane. R. at 128. There are also several letters of thanks written to Crane from various Generals in the Army in the spring of 1994. R. at 160. Each letter commends Crane for his fine work, and one letter from Brigadier General Charles Bauman comments on Crane's "exceptional professional skills." R. at 162.

Finally, Crane's last OER, issued in August of 1994 and covering his performance since January of 1993, reveals that Crane was given all "1's", even in the category evaluating military bearing and appearance, thus indicating that at that time of Crane's discharge his rater opined that Crane had acceptable appearance and bearing under AR 635–100. R. at 157. The rater, Lieutenant Colonel Zophy, also noted that although Crane was over his required weight, it was due to Crane's knee surgery and subsequent rehabilitation over the past year; and as such, no negative notation could be made against him as to his military bearing and appearance. *Id.*

An agency decision is supported by substantial evidence if there is such evidence that a reasonable person " 'might accept as adequate to support a conclusion.' " *Falk v. Secretary of the Army,* 870 F.2d 941, 945 (2d Cir.1989), quoting *Consolidated Edison v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Here, the BOI's decision to discharge plaintiff under AR 635–100 5–10h is supported by only two out of more than one hundred documents in the Administrative Record and the testimony of one out of more than ten witnesses.[14] In contrast, there is a tremendous amount of evidence in the Administrative Record which favors retaining Crane. Most of that evidence are firsthand accounts from the officers and individuals who had frequent and long contact with Crane and who all concluded that he presented an appropriate military appearance. Accordingly, I find that a reasonable person reviewing the record could not determine that the BOI's decision was supported by substantial evidence; and thus, the decision violates that APA.

### III. Constitutional Due Process Claim

Having granted plaintiff relief based on his APA claim, the court need not consider the other arguments raised by the defendant in the motion papers, such as the inadequacy of plaintiff's Constitutional Due Process claim.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied, and plaintiff's cross-motion for summary judgment is granted. Accordingly, the Secretary's decision to discharge the plaintiff under AR 635–100 5–101 is set aside, and the Department of the Army shall reinstate plaintiff as a member of the Army with all duties, responsibilities, and

---

**14.** The testimony of that one witness, DeBarto, was substantially weakened on cross-examination and by the testimony of the officers who saw Crane on a more frequent basis.

privileges earned by plaintiff prior to his discharge.

So ordered.